1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ESTATE OF ALEJANDRO SANCHEZ, et         No.  1:18-cv-00977-ADA-BAM
     al.,
12
                    Plaintiffs,
13                                           ORDER GRANTING, IN PART, AND
          v.                                 DENYING, IN PART, DEFENDANTS'
14                                           MOTION FOR SUMMARY JUDGMENT
     COUNTY OF STANISLAUS, et al.,
15                                           (ECF Nos. 80, 95, 97, 98)
                    Defendants.
16

17                                   **I.**

18                        **Procedural Background**

19        On June 16, 2020, Plaintiffs, Estate of Alejandro Sanchez ("the Estate") and Bertha

20   Sanchez ("Ms. Sanchez"), filed their Second Amended Complaint ("SAC") alleging eleven

21   causes of action against ten defendants: the County of Stanislaus ("the County"), the Stanislaus

22   County Sheriff's Department ("SCSD"), Stanislaus County Sheriff Adam Christianson ("Sheriff

23   Christianson"), and Stanislaus County Sheriff's Deputies Shane Rohn, Brett Babbit, Eugene Day,

24   Justin Camara, Joseph Knittel, Zebedee Poust, and Hector Longoria (referred to collectively as

25   "Deputy Defendants").  (ECF No. 75.)  Defendants filed an Answer on June 29, 2020 denying

26   liability and alleging affirmative defenses.  (ECF No. 76.)  The Court subsequently dismissed

27   Sheriff Christianson from the action on February 12, 2021 pursuant to a stipulation from the

28   parties.  (ECF Nos. 79, 82.)

                                            1

In the SAC, the Estate advances the following nine causes of action: (1) pursuant to 42 U.S.C. § 1983, the use of unreasonable force in violation of the Fourth Amendment to the United States Constitution against all Defendants, (ECF No. 75 at ¶¶ 52–57); (2) pursuant to § 1983, deprivation of procedural due process in violation of the Fourteenth Amendment to the United States Constitution against SCSD, (*id.* at ¶¶ 68–72); (3) unreasonable force in violation of Article I, section 13 of the California Constitution against all Defendants, (*id.* at ¶¶ 73–79); (4) a deprivation of procedural due process in violation of Article I, section 7(a) of the California Constitution against SCSD, (*id.* at ¶¶ 80–84); (5) the failure to discharge a mandatory duty in violation of California Government Code section 815.6 against SCSD, (*id.* at ¶¶ 85–88); (6) pursuant to California Civil Code section 52.1, the use of unreasonable force against all Defendants, (*id.* at ¶¶ 89–95); (7) pursuant to California Civil Code section 52.1, a deprivation of procedural due process against SCSD, (*id.* at ¶¶ 102–106); (8) a state law tort of assault and battery against all Defendants, (*id.* at ¶¶ 107–112); and (9) a state law tort of negligence against all Defendants, (*id.* at ¶¶ 113–118).

Ms. Sanchez alleges the following four causes of action: (1) pursuant to § 1983, a deprivation of her right to familial association, companionship, and society in violation of the Fourteenth Amendment to the United States Constitution against Deputy Defendants, (*id.* at ¶¶ 58–62); (2) pursuant to § 1983, a deprivation of her right to association, companionship, and society in violation of the First Amendment to the United States Constitution against Deputy Defendants, (*id.* at ¶¶ 63–67); (3) pursuant to California Civil Code section 52.1, a deprivation of her right to familial association, companionship, and society against all Defendants, (*id.* at ¶¶ 96–101); and (4) a state law tort of wrongful death against all Defendants, (*id.* at ¶¶ 119–125).

On February 11, 2021, Defendants filed the instant motion for summary judgment.  (ECF No. 80.)  Plaintiffs filed an opposition on March 23, 2021, and Defendants replied on April 13, 2021.  (ECF Nos. 83, 90.)  The Court held a hearing on October 28, 2022.  (ECF No. 110.)  Mark Merin appeared for Plaintiffs and John Whitefleet appeared for Defendants.  (*Id.*)

///

///

2

## II.

## Factual Background[1]

### A.    Initial contact between Mr. Sanchez and Deputies Rohn and Babbitt

At around 10:30 a.m. on May 5, 2018, Deputies Rohn and Babbitt stopped at the Country Girl truck stop in Modesto, California to use the restroom.  (DSF at ¶ 1.)  While Deputy Rohn was inside, Alejandro Sanchez drove up to Deputy Babbitt, who was seated in his patrol vehicle.  (*Id.* at ¶ 3; PSF at ¶ 1; Babbitt Video 31:15–45.)  Sweating and out of breath, Mr. Sanchez reported that someone had stolen the frame on his car and replaced it with a new one.  (PSF at ¶ 2–3; ECF No. 83-3 at 10, 13; Babbitt Video 4:09–27, 31:45–32:30; Babbitt Decl. at ¶ 4; Rohn Video 5:50–6:05.)  Deputy Babbitt noticed that Mr. Sanchez's car was not in compliance with California Vehicle Code regulations.[2]  (DSF at ¶ 4.)  He then requested Mr. Sanchez's

---

[1] Throughout this order, the Court will cite to the parties' statements of facts.  For ease of reference, the Court will refer to statements in Defendants' "Reply to Plaintiffs' Response to Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment," docketed as ECF No. 90-1, as "Defendants' Statement of Facts," or "DSF."  The Court will refer to "Defendants' Response to Plaintiffs' Statement of Disputed Facts in Support of Opposition to Defendants' Motion for Summary Judgment," docketed as ECF No. 90-2, as "Plaintiffs' Statement of Facts," or "PSF," because it presents a full account of Plaintiffs' version of events.

Defendants submitted declarations from each Deputy Defendant as their Exhibits A–G.  (*See* ECF No. 80-4 at 2.)  The Court will cite to each of these declarations by paragraph number rather than ECF page number (e.g., "Rohn Decl. at ¶ 1").

Each party also submitted excerpts from depositions of Deputy Defendants, independent witness Alex Perez, and experts Werner Spitz and Scott Defoe.  (*See* ECF No. 80-4 at 2 (listing deposition transcripts of Deputies Rohn, Babbitt, Day, and Camara as Exhibits H–K); ECF No. 83-3 at 6 (listing deposition transcripts of Dr. Spitz, Mr. Defoe, Mr. Perez, and Deputies Rohn, Day, and Babbitt as Exhibits 10, 12, 18, 23, 24, and 34).)  The Court will cite to these transcripts by page and line number rather than ECF page number (e.g., "Rohn Depo. 1:1–2").

Plaintiffs have lodged video recordings of interviews with Deputies Babbitt, Rohn, Day, Camara, Knittel, and Poust as Exhibits 2, 4, 6, 8, 16, and 20.  (*See* ECF No. 83-3 at 6; ECF No. 100.)  The Court will cite to these videos by time stamp rather than docket number (e.g., "Rohn Video 1:23").

The parties' remaining exhibits consist of excerpts from police reports, expert and autopsy reports, photographs, SCSD policies, and various communications between the parties.  The Court will refer to all these materials by ECF docket and page number.

[2] The parties dispute the nature of the Vehicle Code violation that Deputy Babbitt initially observed.  Defendants claim that Deputy Babbitt saw expired registration tags on Mr. Sanchez's vehicle.  (PSF at ¶ 4; Babbitt Decl. at ¶ 5; Babbitt Depo 20:3–10.)  Deputy Babbitt's video interview does not corroborate this assertion, as he stated that he planned to cite Mr. Sanchez for driving with expired registration after receiving information from dispatch about the status of Mr. Sanchez's vehicle.  (Babbitt Video 10:10–17; ECF No. 83-3 at 11.)  Plaintiffs, relying on a summary of Deputy Rohn's observations, contend that Mr. Sanchez's vehicle lacked license plates, and that the deputies only discovered Mr. Sanchez's expired registration after running his Vehicle Identification Number.  (PSF at ¶ 4; ECF No. 83-3 at 20; Rohn Video 6:26–30; Rohn Decl. at ¶ 8.)  This dispute is immaterial given that both parties describe regulatory vehicle code violations that were readily apparent to the deputies.  *See* Cal. Veh. Code §§ 5200, 5204.

identification card and called dispatch to run a wants and warrants check.  (PSF at ¶ 5; ECF No. 83-3 at 10; Babbitt Video 5:25–40; Babbitt Decl. at ¶ 5.)  As Mr. Sanchez spoke, Deputy Babbitt observed that he was "agitated" and "pretty amped up."  (PSF at ¶ 6.; ECF No. 83-3 at 10; Babbitt Video 5:40–45.)  Around this time, Deputy Rohn approached and saw that Mr. Sanchez was "pacing" or "prancing" and making nonsensical statements.  (*See* DSF at ¶ 5; PSF at ¶ 7; ECF No. 83-3 at 20; Rohn Video 6:13–25.)  He then asked Mr. Sanchez to sit on a nearby circular planter while dispatch ran the check.  (DSF at ¶ 5; ECF No. 83-3 at 20; Rohn Video 6:32–40; Rohn Decl. at ¶ 9; Rohn Depo. 18:16–17.)  Mr. Sanchez complied.  (DSF at ¶ 5; PSF at ¶ 9; Rohn Video 6:40–42; Rohn Decl. at ¶ 9.)  While sitting, Mr. Sanchez made comments, some of which Deputy Rohn described as "irrational," about his employment with a porta-potty company and his desire to clear up the issue with his vehicle.[3]  (PSF at ¶¶ 12–13; ECF No. 83-3 at 20; Rohn Video 7:12–34, 8:13–23; Rohn Decl. at ¶ 10.)  Shortly thereafter, Deputies Camara and Day arrived.  (DSF at ¶ 6.)  Eventually, dispatch responded to Deputy Babbitt, informing him that there were no active wants or warrants for Mr. Sanchez, but that his vehicle was registered as "Planned Non-Operational."  (*See* PSF at ¶¶ 10, 14; ECF No. 83-3 at 10; Babbitt Video 5:57–6:05.)  Because of this, the deputies then decided to tow Mr. Sanchez's vehicle.  (ECF No. 83-3 at 21, 41; Rohn Video 8:44–48; Day Video 4:38–46; Camara Video 5:35–55.)

**B.    The physical struggle between Mr. Sanchez and Deputy Defendants**

As the deputies continued their investigation, Mr. Sanchez requested that they "hurry up" and asked for permission to call his mother for a ride.  (PSF at ¶¶ 16–17; ECF No. 83-3 at 21; Rohn Video 9:00–17.)  Deputy Rohn continued to notice that Mr. Sanchez was not acting "normal."  (PSF at ¶ 19; ECF No. 83-3 at 21.)  He believed Mr. Sanchez's behavior to be consistent with someone under the influence, but Mr. Sanchez denied consuming any medications, drugs, or alcohol.  (*See* PSF at ¶¶ 19–20; DSF at ¶ 9; ECF No. 83-3 at 21; Rohn Video at 9:50–10:18; Rohn Decl. at ¶ 10.)  While still seated, Mr. Sanchez abruptly opened his cell phone and began to yell, "Come and help me, they are trying to kill me."  (PSF at ¶ 21; *see*

---

[3] Defendants dispute this description of Mr. Sanchez.  (*See* PSF at ¶ 12–13.)  Their dispute, however, appears to be based on evidentiary objections that the Court addresses in this order rather than the existence or non-existence of a fact.  (*See id.*)

*also* DSF at ¶ 8; ECF No. 83-3 at 10, 21, 33; Babbitt Video 6:42–57; Babbitt Decl. at ¶ 8; Rohn Video 10:40–46; Rohn Decl. at ¶ 11; Camara Video 6:30–34.)  The deputies ordered Mr. Sanchez to remain calm and seated on the curb, but he became agitated and began to stand.  (PSF at ¶¶ 22–23, 26; DSF at ¶ 7; Rohn Decl. at ¶ 12; Rohn Depo. 18:22; Day Decl. at ¶ 5; Camara Decl. at ¶ 6.)

At this point, the deputies decided to place Mr. Sanchez on a "5150 hold" – an involuntary mental health detention – and Deputies Babbitt, Rohn, and Day grabbed his arms and hands.  (PSF at ¶ 25; DSF at ¶ 10; ECF No. 83-3 at 21, 41; Rohn Video 11:03–11:10; Camara Video 6:45–50.)  While the parties agree that Mr. Sanchez then ended up on the ground in a prone position with his face and chest on the asphalt parking lot, (PSF at ¶ 28; DSF at ¶ 12), they dispute the nature of events that brought him there.  Defendants contend that, as the deputies held him, Mr. Sanchez pulled his arms away and continued to stand with a momentum that brought himself and Deputies Babbit, Day, and Rohn to the ground.  (DSF at ¶¶ 11–12.)  Plaintiffs, on the other hand, argue that Deputies Rohn, Babbitt, and Day tackled Mr. Sanchez.  (PSF at ¶ 27; *see also* ECF No. 83-3 at 21, 33; Rohn Video 11:14–28; Day Video 5:48–56; Camara Video 7:03–05.)  The deputies then pinned Mr. Sanchez to the ground, with Deputy Rohn on his right shoulder, Deputy Babbitt on his left shoulder, and Deputy Day on his back.  (PSF at ¶¶ 29–31, 39; DSF at ¶¶ 17–19; ECF No. 83-3 at 21, 251; Babbitt Decl. at ¶ 11; Babbitt Depo. 23:11–16; Rohn Video 11:50–59; Rohn Decl. at ¶ 14; Rohn Depo. 22:2–12, 23:6; Day Video 6:38–47; Day Decl. at ¶ 8; Day Depo. 14:16–21.)  At the same time, Deputy Camara applied an ankle lock to Mr. Sanchez and continued to restrain Mr. Sanchez's legs to prevent him from moving.  (PSF at ¶ 32; DSF at ¶ 24; Rohn Depo. 23:25; Camara Video 7:10–36; Camara Decl. at ¶ 7; Camara Depo. 11:14–12:6.)  Plaintiffs argue, based on Deputy Rohn's subsequent statements, that the officers used approximately 550 to 600 pounds of pressure to restrain Mr. Sanchez.  (PSF at ¶ 40; *see also* DSF at ¶ 15; ECF No. 83-3 at 21; Rohn Video 12:00–05.)  As the deputies repeatedly ordered him to stop resisting, Mr. Sanchez moved his arms under his body and attempted to lift himself off the ground.[4]  (PSF at ¶ 33; DSF at ¶ 15–16, 20; ECF No. 83-3 at 11, 21, 33; Babbitt Video

---

[4] Defendants dispute the extent to which Mr. Sanchez was able to lift his torso from the ground.  (*See* PSF at ¶ 33 ("Sanchez did not just 'attempt' to lift himself off the ground.  Sanchez was able to lift himself off the ground by placing his hands into the ground and lifting himself up a [sic] push-up style maneuver.").)

1  8:27–37, 12:50–52; Babbitt Decl. at ¶ 10; Rohn Video 11:30–11:50; Rohn Decl. at ¶ 13; Day

2  Decl. at ¶ 7.)  Defendants attribute Mr. Sanchez's actions to a conscious attempt to resist

3  detention.  (DSF at ¶ 15; Babbitt Video 12:30–38; Day Video 20:10–14; Camara 14:20–33.)

4  Plaintiffs, on the other hand, claim that Mr. Sanchez's conduct was consistent with someone

5  struggling to breathe against the weight of the deputies on top of him.  (PSF at ¶ 34; *see also* DSF

6  at ¶ 15; Perez Depo. 20:17–25, 20:22–21:4; Spitz Report, ECF No. 83-3 at 49; Spitz Depo. 27:9–

7  28:11.)  At one point, Deputy Babbitt felt Mr. Sanchez bite him on the arm.  (ECF No. 83-3 at 11;

8  Babbitt Video 8:45–57; Babbitt Decl. at ¶ 11.)

9         To prevent Mr. Sanchez from rolling, Deputy Rohn placed his left knee on Mr. Sanchez's

10  torso.  (PSF at ¶ 35; ECF No. 83-3 at 22; Rohn Video 13:40–44.)  Deputy Rohn then grabbed Mr.

11  Sanchez's wrist and hand as Mr. Sanchez reached towards Deputy Rohn's taser, which was

12  attached to the deputy's hip.[5]  (DSF at ¶¶ 22–23; ECF No. 83-3 at 22; Rohn 13:32–40, 23:09–15;

13  Rohn Decl. at ¶ 15.)  Deputy Rohn also held Mr. Sanchez's head against the ground with his shin

14  to prevent it from moving.  (PSF at ¶ 36–38; ECF No. 83-3 at 22; Rohn Video 55:58–56:17.)

15  Deputy Day was then able to attach a set of handcuffs to one of Mr. Sanchez's wrists, and Deputy

16  Babbitt attached a separate set to Mr. Sanchez's other wrist.  (DSF at ¶ 25; PSF at ¶ 43; ECF No.

17  83-3 at 11; Babbitt Video at 13:50–52; Babbitt Decl. at ¶ 12.)  Deputies Rohn, Babbitt, and Day

18  then pulled the two sets of handcuffs together, connecting them in a double-cuffing manner.  (PSF

19  at ¶ 45; DSF at ¶ 26; ECF No. 83-3 at 11; Babbitt Video at 13:58–14:02.)  During this process, a

20  handcuff caught Deputy Day's hand, scratching him and causing him to bleed.  (ECF No. 83-3 at

21  33; Day Video 7:50–8:00, 9:00–05.)  Deputy Day noticed that the handcuff on Mr. Sanchez's

22  right wrist was not properly adjusted, and its tightness was probably incredibly painful for Mr.

23  Sanchez.  (ECF No. 83-3 at 33–34; Day Video 9:23–40, 14:00–15.)  He intended to adjust the

24  handcuff after the deputies were able to restrain Mr. Sanchez fully.  (Day Video 9:23–40.)

25  ///

26  ///

27  _____

28  [5] Plaintiffs dispute that Mr. Sanchez reached back toward Deputy Rohn's taser but fail to present evidence sufficient to create a dispute of fact on the issue.  (*See* DSF at ¶ 22.)

**C.      Placement of the WRAP restraint**

During the struggle, Deputies Knittel, Poust, and Longoria arrived on scene.  (PSF at ¶ 48.)  Deputy Knittel initially placed his knee on Mr. Sanchez's thigh while Deputy Day laid on top of Mr. Sanchez in what Deputy Rohn described as a "wrestling sprawl."  (PSF at ¶¶ 30, 49–50; ECF No. 83-3 at 22, 251; Rohn Video 14:45–55; Knittel Video 7:45–8:05; Knittel Decl. at ¶ 5.)  Deputy Knittel then retrieved a Wellness Recovery Action Plan ("WRAP") device from Deputy Day's vehicle.  (PSF at ¶ 52; ECF No. 83-3 at 251; Rohn Video 15:00–05; Knittel Video 8:30–40.)  To employ a WRAP properly, officers must put an individual in an upright seated position, placing a harness around that person's torso and restraints around the arms, legs, and ankles.  (DSF at ¶ 28.)  Even though he had access to a fully functioning WRAP, Deputy Knittel grabbed one that was missing an ankle strap.  (PSF at ¶ 53, 69; Knittel Video 8:42–45, 10:00–15.)  Noticing the deficiency, Deputy Knittel retrieved an ankle strap from Deputy Rohn's car.  (Knittel Video 9:08–12.)  When Deputy Knittel arrived with the WRAP, the deputies struggled to apply it while Mr. Sanchez foamed at the mouth and continued to yell that the deputies were trying to kill him.  (PSF at ¶¶ 54–56; ECF No. 83-3 at 22; Knittel Video 11:40–50; Poust Video 12:20–40.)  Because the WRAP was not big enough to fit around Mr. Sanchez's torso, the deputies used an extra pair of handcuffs to lengthen the WRAP's torso strap.  (*See* DSF at ¶ 28; ECF No. 83-3 at 12, 34; Babbitt Video 16:30–45; Rohn Video 44:45–45:06; Rohn Depo. 38:20–21; Poust Video 15:00–15.)  Both Deputy Day and Deputy Knittel denied ever seeing a WRAP applied in such a way.  (PSF at ¶ 72; ECF No. 83-3 at 34, 252; Knittel Video 23:25–35.)  In an effort to help control Mr. Sanchez and apply the WRAP, Deputy Poust placed his knee on the back of Mr. Sanchez's head, Deputy Longoria pressed Mr. Sanchez's neck forward with his hand, and Deputy Rohn pressed his knee between Mr. Sanchez's shoulder blades.  (DSF at ¶¶ 31–32; PSF at ¶¶ 61–63; ECF No. 83-3 at 278; Rohn Video 15:40–50, 16:00–07; Poust Video 10:00–11:15; Poust Decl. at ¶ 5; Longoria Decl. at ¶ 6.)  Eventually, the deputies secured Mr. Sanchez inside the WRAP and sat him upright.  (DSF at ¶¶ 33–34; PSF at ¶ 73.)  A deputy placed a spit mask on Mr. Sanchez because he was spitting and frothing at the mouth.[6]  (ECF No. 83-3 at 22,

---

[6] After reading reports and depositions about the incident and watching the videos of the deputies, the Court is still

41; Rohn Video 15:22–28, 15:40–42; Camara Video 12:30–42.)  Alex Perez, an independent eyewitness, estimated that Mr. Sanchez was on the ground beneath the deputies for approximately 10 minutes.  (PSF at ¶ 75; Perez Depo. 20:8–16.)  Deputy Rohn estimated the entire incident took between three and five minutes.  (ECF No. 83-3 at 25; Rohn Video 50:23–48; Rohn Decl. at ¶ 19; Day Decl. at ¶ 12; Poust Video 49:05–10.)

**D.      The drive to the hospital and Mr. Sanchez's death**

After securing Mr. Sanchez in the WRAP, Deputy Longoria requested a "Code Two" ambulance – no lights, no siren – but dispatch informed him its arrival would be delayed.  (PSF at ¶¶ 79–80; ECF No. 83-3 at 23, 251, 253; Rohn Video 17:30–38; Knittel Video 10:45–47, 27:15–35.)  Deputy Longoria then told Deputies Babbitt and Rohn to transport Mr. Sanchez to the hospital themselves.[7]  (PSF at ¶ 81; ECF No. 83-3 at 23; Rohn Video 17:40–45.)  Three or four deputies then placed Mr. Sanchez in the back of a cruiser and Deputies Babbitt and Rohn drove him to Doctor's Medical Center of Modesto.  (*See* DSF at ¶¶ 38, 40; PSF at ¶¶ 82, 83.)  Defendants claim that Mr. Sanchez was screaming up until five to eight minutes into the ride, when he became unresponsive.  (DSF at ¶¶ 39, 41; ECF No. 83-3 at 12, 23; Babbitt Video 19:35–48; Rohn Decl. at ¶ 21.)  Plaintiffs contend, however, that an eyewitness saw Mr. Sanchez become unresponsive just prior to the deputies placing him in an upright position after applying the WRAP.  (PSF at ¶ 67; Perez Depo. 14:9–17, 31:1–15.)  When Deputies Babbitt and Rohn heard Mr. Sanchez stop screaming, they stopped the car to check on him.  (ECF No. 83-3 at 12, 23; Babbitt Video 19:10–20:02; Babbitt Decl. at ¶ 17; Rohn Video 18:50–19:35.)  Mr. Sanchez was unresponsive but still had a pulse, and Deputy Rohn noticed that Mr. Sanchez had aspirated something onto the spit mask.  (ECF No. 83-3 at 12, 23; Babbitt Video 20:40–21:12; Rohn Video 19:44–20:10.)  The deputies got back in the cruiser and drove with their lights and sirens on to the hospital.  (ECF No. 83-3 at 12, 23; Babbitt Video 21:17–23; Rohn Video 20:22–35.)

///

unable to determine which deputy placed the spit mask on Mr. Sanchez and whether it was fastened while Mr. Sanchez was still prone or when he was sitting in an upright position.  (*See, e.g.*, Perez Depo. 13:21–14:8, 31:1–6.)

[7] The deputies wanted to clear Mr. Sanchez at the hospital because he had received several abrasions during the struggle and Deputy Rohn thought he may have broken Mr. Sanchez's fingers.  (Rohn Video 48:00–48.)

1    Mr. Sanchez was pronounced dead at the hospital at 11:37 a.m.  (DSF at ¶ 42.)  An

2    autopsy of Mr. Sanchez's body identified the cause of death as a "traumatic subarachnoid

3    hemorrhage."  (PSF at ¶ 87; Autopsy Report, ECF No. 83-3 at 347.)  The report also documented

4    numerous external injuries, including bruising on the back and arms and abrasions on the

5    forehead, shoulders, arms, wrists, legs, knees, and feet.  (*Id.*)  Finally, the report noted "cerebral

6    edema;" "diffuse intercostal muscle hemorrhage of the left chest cavity;" "hemoperitoneum;"

7    "focal superficial laceration of the liver;" "hypertrophy of the right and left ventricular

8    myocardium;" and "arteriosclerotic coronary artery disease, slight."  (*Id.*)

9    **E.      Plaintiffs' citizen complaint**

10   On December 4, 2018 – several months after Plaintiffs filed the initial complaint in this

11   matter – the family of Mr. Sanchez submitted a citizen complaint to SCSD, pursuant to California

12   Penal Code section 832.5(a)(1) and SCSD's Policy 1020, alleging that Deputy Defendants used

13   excessive force resulting in Mr. Sanchez's death.  (PSF at ¶¶ 88, 90; ECF No. 83-3 at 370–71.)

14   Plaintiffs' counsel, Mr. Merin, drafted the complaint and listed the Estate, Ms. Sanchez, and Mr.

15   Sanchez's three sisters as complainants.  (ECF No. 83-3 at 370–71.)  Mr. Sanchez's family

16   received no response from SCSD until January 8, 2020, when Defendants' attorney, Mr.

17   Whitefleet, responded to a letter requesting an update on the investigation.  (PSF at ¶¶ 91–93.)

18   That response did not address the substance of the request for an update on the status of the

19   citizen complaint.  (PSF at ¶ 93; ECF No. 83-3 at 411.)

20                                            **III.**

21                         **Motion for Summary Judgment Legal Standard**

22   A court may grant summary judgment when "there is no genuine dispute as to any

23   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

24   fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

25   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists when "the evidence is

26   such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The purpose of

27   this inquiry is to determine whether "there are any genuine factual issues that properly can be

28   resolved only by a finder of fact because they may reasonably be resolved in favor of either

                                              9

1   party." *Id.* at 250.

2         The moving party bears the initial burden of "identifying those portions of the pleadings,

3   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

4   which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

5   *Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted); *see also* Fed. R. Civ. P.

6   56(c).  If the moving party bears the burden of proof on a particular issue at trial, it must provide

7   affirmative evidence demonstrating that "no reasonable trier of fact could find other than for the

8   moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  When the

9   nonmoving party bears the burden at trial, however, "the movant can prevail merely by pointing

10  out that there is an absence of evidence to support the nonmoving party's case." *Id.*; *see also*

11  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

12        If the moving party meets its initial burden, the nonmoving party must then establish that

13  there are "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle*

14  *Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 324); *see*

15  *also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  While

16  the nonmoving party must demonstrate more than a "scintilla of evidence," it need not establish a

17  material issue of fact conclusively in its favor. *Anderson*, 477 U.S. at 252.  It is sufficient that the

18  "claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

19  versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d

20  626, 630 (9th Cir. 1987).

21        At summary judgment, the court draws all inferences and views all evidence in the light

22  most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587–88; *Walls v. Cent. Contra*

23  *Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It also considers undisputed facts as true

24  for purposes of ruling on the motion.  *See Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740,

25  745 (9th Cir. 2010).

26  ///

27  ///

28  ///

1   **IV.**

2   **Defendants' Evidentiary Objections**

3        As an initial step, the Court must address the various objections that Defendants have

4   raised to 27 items of evidence that Plaintiffs submitted in support of their opposition to

5   Defendants' motion for summary judgment.  (*See* ECF No. 90-3.)  Courts may only consider

6   admissible evidence when ruling on a motion for summary judgment.  *See* Fed. R. Civ. P.

7   56(c)(2), (e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

8   Nevertheless, "[t]o survive summary judgment, a party does not necessarily have to produce

9   evidence in a form that would be admissible at trial, as long as the party satisfies the requirements

10  of Federal Rules of Civil Procedure 56."  *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th

11  Cir. 2001).  The Court's focus, therefore, is on the admissibility of the proffered evidence's

12  contents rather than its form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

13       As discussed in more detail below, the Court will sustain Defendants' objections to

14  Exhibits 13 and 17 only.  All other objections are overruled.

15  **A.    Legal standards for admissibility at summary judgment**

16       **i.    Objections to relevance, speculation, vagueness, improper legal conclusion,**

17             **and misstated facts**

18       Objections to evidence on the ground that it is irrelevant is duplicative of the summary

19  judgment standard itself.  *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021)

20  (citing *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).  "[I]f

21  evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by

22  definition, 'of consequence in determining the action,' and therefore relevant."  *Id.* (quoting Fed.

23  R. Evid. 401).  "Conversely, if the submitted evidence does not create a genuine dispute of

24  material fact, there is no need for the court to separately determine whether it is relevant because,

25  even assuming it is not, it will not affect the ultimate summary judgment ruling."  *Id.*  This

26  reasoning applies with equal force to objections based on speculation, vagueness, improper legal

27  conclusions, or argumentative statements because such statements are not facts.  *See Zoom*

28  *Imaging Sols., Inc. v. Roe*, No. 2:19-cv-01544 WBS KJN, 2022 WL 4025293, at *3 (E.D. Cal.

11

1    Sept. 2, 2022); *Alvarez v. T-Mobile USA, Inc.*, No. CIV. 2:10–2373 WBS GGH, 2011 WL

2    6702424, at \*3 (E.D. Cal. Dec. 21, 2011).

3           The Court will not address Defendants' numerous relevance-related objections

4    individually.  All are overruled.

5           **ii.     Objections to hearsay**

6           Hearsay evidence is typically inadmissible unless a federal statute or rule provides

7    otherwise.  *See* Fed. R. Evid. 801, 802.  Nevertheless, "at summary judgment a district court may

8    consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence

9    could be provided in an admissible form at trial, such as by live testimony."  *JL Beverage Co.,*

10   *LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

11          Defendants make only generalized hearsay objections to 17 of Plaintiffs' exhibits in their

12   entirety, and the Court will address them below.  To the extent Defendants object to specific

13   portions of any exhibit, however, "their unexplained generalized objections [are] insufficient to

14   raise such an objection."  *Sandoval*, 985 F.3d at 666.  The Court will not comb through each

15   exhibit to locate potential hearsay that Defendants have not themselves identified.  *See Burch*,

16   433 F. Supp. 2d at 1124 ("The burden is on defendants to state their objections with specificity.").

17          **iii.    Objections to authentication and foundation**

18          Prior to admitting an exhibit at trial, Federal Rule of Evidence 901(a) requires parties to

19   "produce evidence sufficient to support a finding that the item is what the proponent claims it is."

20   Fed. R. Evid. 901(a).  "It is well settled that unauthenticated documents cannot be considered on a

21   motion for summary judgment."  *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir.

22   1987).  Where it is necessary to authenticate a document through personal knowledge, the

23   proponent of the evidence must supply the court with an affidavit.  *Orr v. Bank of Am., NT & SA*,

24   285 F.3d 764, 773–74, 778 n.24 (9th Cir. 2002).  Where personal knowledge is not necessary,

25   courts "must consider alternative means of authentication under Federal Rules of Evidence

26   901(b)(4)."  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011).  Rule 901(b)(4)

27   permits authentication based on "the appearance, contents, substance, internal patterns, or other

28   distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid.

1   901(b)(4).  Moreover, "courts generally are much more lenient with the affidavits of a party

2   opposing a summary judgment motion."  *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir.

3   1979); *see also Gomez v. City of Vacaville*, 483 F. Supp. 3d 850, 860–61 (E.D. Cal. 2020)

4   (considering evidence at summary judgment that the proponent did not properly authenticate

5   "because the authentication issue may be cured at trial; nothing about the document's contents

6   suggests it would be inadmissible at trial if properly authenticated").  This is especially true when

7   the authenticity of the challenged evidence is not actually in dispute, and the objecting party has

8   made an objection on "purely procedural grounds."  *See Burch*, 433 F. Supp. 2d at 1120–21.

9   **B.     Application to Defendants' objections**

10          **i.          Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 15, 16, 19, and 20: Video footage of Deputy**

11                      **Defendants providing statements to investigating officer and investigating**

12                      **officer's written summaries of those statements**

13          Defendants object to Exhibits 2, 4, 6, 8, 16, and 20 – video recordings of Deputies

14   Babbitt, Rohn, Day, Camara, Knittel, and Poust providing statements to an interviewing officer –

15   on hearsay, authentication, and foundation grounds.  (ECF No. 90-3 at 3, 4–5, 6–8, 16, 19–20.)

16   They object to Exhibits 1, 3, 5, 7, 15, and 19 – summaries of those statements that the

17   interviewing officer memorialized – on the same grounds.  (*Id.* at 2–3, 4, 5–7, 15, 18–19.)

18   Defendants' hearsay objections are without merit because the information in the statements would

19   be available at trial through live testimony.  Additionally, the video recordings themselves would

20   be admissible as opposing party statements.  *See* Fed. R. Evid. 801(d)(2).  The Court does note

21   that the summarized statements contain two layers of hearsay – the deputies' statements and the

22   interviewing officer's summary of those statements.  To be admissible, each layer of hearsay

23   must conform to an exception contained within the Federal Rules of Evidence.  *See* Fed. R. Evid.

24   805.  This does not, however, pose an obstacle to their use at summary judgment.  While the

25   interviewing officer's summarized reports would not be admissible themselves, Plaintiffs could

26   call the interviewing officer to testify to the deputies' statements pursuant to Federal Rule of

27   Evidence 801(d)(2).

28   ///

Defendants' authentication and foundation objections are similarly without merit.  First, as discussed above, Plaintiffs could produce the contents of both the videos and summarized statements by way of live testimony, obviating the need to authenticate the actual documents.  Additionally, given the fact that Defendants produced all these documents in discovery, the Court has difficulty believing there is an actual dispute regarding their authenticity.  (*See* Declaration of Mark E. Merin in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Merin Decl.") at ¶¶ 2–9, 16–17, 20–21, ECF No. 83 at 60–62.)  Even if Plaintiffs did attempt to introduce the documents at trial, and there was an actual dispute regarding their authenticity, authentication would not require an affidavit of personal knowledge.  Each video recording contains images of the Deputy Defendants and records each of them saying their names.  They all describe the events at issue in this litigation.  Similarly, every page of each report contains a heading that includes the name, address, and phone number of the Stanislaus County Sheriff's Department and lists a "Location of Occurrence" of 1201 S. 7th St., Modesto CA, the location where the incident at issue in this case took place.  Like the video recordings, the summary reports also contain specific factual details that tie them to this case.  These are the kind of distinctive characteristics that would support authentication at trial under Federal Rule of Evidence 901(b)(4).

Therefore, the Court overrules the hearsay, authentication, and foundation objections to Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 15, 16, 19, and 20.

      **ii.**      **Exhibits 17 and 18: Summary of Alex Perez's statement to investigating officer and Mr. Perez's deposition testimony**

Defendants object to the admission of Exhibit 17 – an investigating officer's written summary of a statement from Alex Perez – on hearsay and authentication grounds.  (ECF No. 90-3 at 16–17.)  The Court's analysis of this exhibit differs from the analysis regarding the summaries of Deputy Defendants' statements.  Mr. Perez is an independent witness, not an opposing party.  Therefore, a hearsay exception would need to apply to the interviewing officer's summary in order for it to be admissible at trial.  The Court cannot readily discern an applicable exception, and Plaintiffs have provided none.

14

1    Mr. Perez's deposition transcript – Exhibit 18 – does not, however, encounter the same

2    problem.  Its contents would be admissible at trial through Mr. Perez's testimony.  Moreover,

3    deposition testimony is authenticated when the document contains the name of the deponent, the

4    name of the action, and the reporter's certification that the deposition is a true record of the

5    deponent's testimony.  *Orr*, 285 F.3d at 774.  Exhibit 18 satisfies each of these requirements.

6    (*See* ECF No. 83-3 at 260, 275.)  Defendants also argue that Mr. Perez's statement that Deputy

7    Defendants were piled on top of Mr. Sanchez for approximately ten minutes calls for an expert

8    opinion.  (*See* ECF No. 90-3 at 18.)  Defendants do not provide any argument as to why this

9    estimate could conceivably constitute expert testimony.  Rather, it appears to be permissible lay

10    opinion testimony "rationally based on [Mr. Perez's] perception."  *See* Fed. R. Evid. 701.

11    Therefore, the Court sustains the hearsay objection to Exhibit 17 but overrules the

12    hearsay, authentication, and improper expert opinion objections to Exhibit 18.

13        **iii.**    **Exhibits 9, 10, 11, and 12: Expert reports and depositions of Dr. Werner Spitz**

14                 **and Scott Defoe**

15    Defendants object to Exhibits 9 and 11 – the expert reports of Dr. Spitz and Mr. Defoe –

16    on grounds of authentication and hearsay.  (ECF No. 90-3 at 9–10, 11–12.)  "Expert opinion is

17    admissible and may defeat summary judgment if it appears the affiant is competent to give an

18    expert opinion and the factual basis for the opinion is stated in the affidavit, even though the

19    underlying factual details and reasoning upon which the opinion is based are not."  *Bulthuis v.*

20    *Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir. 1985).  Expert reports must be signed under penalty

21    of perjury, and unsworn reports are typically inadmissible at summary judgment.  *See Harris v.*

22    *Extendicare Homes, Inc*., 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011); *see also* 28 U.S.C. §

23    1746 (permitting an "unsworn declaration, certificate, verification, or statement" made under

24    penalty of perjury in lieu of a formal affidavit)  Nevertheless, courts need not exclude the expert

25    report of a party opposing summary judgment if its only defect is the lack of a signature under

26    penalty of perjury.  *See Single Chip Sys. Corp. v. Intermec IP Corp.*, No. 04CIV1517 JAH

27    (CAB), 2006 WL 4660129, at *5–*7 (S.D. Cal. Nov. 6, 2006); *Competitive Techs., Inc. v. Fujitsu*

28    *Ltd.*, 333 F. Supp. 2d 858, 863–64 (N.D. Cal. 2004).

1    At the outset, the Court notes that, while both expert reports have signatures, neither

2  contains a declaration under penalty of perjury.  (*See* ECF No. 83-3 at 49, 183.)  This defect in

3  form, however, is merely superficial – both experts testified about the contents of their reports

4  during a deposition under penalty of perjury.  (*See id.* at 85, 195.)  They could do the same at a

5  trial, rendering Defendants' hearsay objections meritless.  *See Sandoval*, 985 F.3d at 666.

6  Additionally, after reviewing the reports and accompanying curriculum vitae, the Court notes that

7  both experts appear competent to provide their opinions.  They also provide the factual bases for

8  their opinions, which include most of the exhibits the parties provided in support of their

9  respective moving papers.  Additionally, Defendants have failed to provide any argument as to

10  why the Court should not find the reports admissible under Federal Rule of Evidence 702.

11    Defendants' object to specific portions of Exhibits 10 and 12 – the deposition transcripts

12  of Dr. Spitz and Mr. Defoe – on grounds of authentication, hearsay, and improper expert opinion.

13  (ECF No. 90-3 at 10, 12–14.)  At the outset, the Court notes that deposition testimony is

14  authenticated when the document contains the name of the deponent, the name of the action, and

15  the reporter's certification that the deposition is a true record of the deponent's testimony.  *Orr*,

16  285 F.3d at 774.  These requirements are satisfied here.  (*See* ECF No. 83-3 at 81, 121, 192, 242.)

17    Defendants argue that Plaintiffs' claim that "Mr. Sanchez struggled to breath [sic] with the

18  Deputies on top of him" misstates Dr. Spitz's testimony.  (ECF No. 90-3 at 10.)  They also argue

19  that the articles on which Dr. Spitz based some of his conclusions are inadmissible because they

20  examined incidents of restraint dissimilar from the one at issue in this case.  (*Id.* at 10.)  Similarly,

21  they point out a number of instances where they allege Mr. Spitz's testimony was contradictory,

22  inconsistent, and conclusory.  (*Id.* at 12–14.)  These arguments represent concerns about the

23  adequacy – rather than the admissibility – of the expert testimony.  Defendants would be better

24  served arguing in their motion for summary judgment that the expert opinions do not create a

25  dispute of material fact.  *See Burch*, 433 F. Supp. 2d at 1119 ("Instead of *objecting*, parties should

26  simply *argue* that the facts are not material.").  Regardless, an inquiry into the "facts and data

27  underlying [an expert's] opinion and his method of arriving at it" is fodder for cross-examination

28  at trial, not summary judgment.  *Bieghler v. Kleppe*, 633 F.2d 531, 534 (9th Cir. 1980).

16

1    Defendants' hearsay, authentication, and improper expert testimony objections to Exhibits

2    9, 10, 11, and 12 are overruled.

3        **iv.       Exhibit 13: Voicemail recording of Mr. Sanchez**

4    Defendants object to Exhibit 13 – a voicemail recording of Mr. Sanchez – on hearsay and

5    authentication grounds. (ECF No. 90-3 at 14.)  The contents of the recording contain numerous

6    screams, cries for help, and orders to "stop resisting."  (*See* ECF No. 83-3 at 244.)  It is unclear

7    that the recording contains any hearsay at all.  Even if it did, it appears that the recording could be

8    admissible at trial as an excited utterance.  Fed. R. Evid. 803(2).  Any discernible officer

9    statements in the recording would also be admissible as opposing party statements.  Fed. R. Evid.

10   801(d)(2).

11   The Court agrees, however, that Plaintiffs have failed to authenticate the recording.

12   Plaintiffs do not provide an affidavit based on personal knowledge, and it is unclear whether they

13   could authenticate the recording at trial.  While the content of the recording resembles the

14   descriptions of the struggle that Deputy Defendants describe in their interviews, there is nothing

15   distinctive about the audio that ties it to this case.  The Court cannot discern the use of anyone's

16   name, the location of the struggle, or the time of day.  Nor did Plaintiffs provide the phone

17   numbers or other identifying information associated with the phones that transmitted and received

18   the message.

19   The Court sustains Defendants' authentication objection to Exhibit 13.

20       **v.       Exhibits 14, 21, and 25: Photographs**

21   Defendants object to Exhibits 14, 21, and 25 on authentication grounds.  (ECF No. 90-3 at

22   14–15, 20–21.)  The Court is hard-pressed to believe that there is a genuine dispute as to the

23   authenticity of these photographs given that Defendants produced them during discovery.  (*See*

24   Merin Decl. at ¶¶ 15, 22, 26.)  Moreover, in considering the distinctive characteristics of the

25   images alongside the other admissible evidence that both parties provided in support of their

26   moving papers, the Court can determine that the photographs are what Plaintiffs purport them to

27   be: images of the WRAP device, images of Deputy Babbitt's injuries, and images of Deputy

28   Day's injuries.

1    Defendants' authentication objections to Exhibits 14, 21, and 25 are overruled.

2        **vii.    Exhibit 22: CAD Response Report**

3    Defendants object to admission of Exhibit 22 on authentication grounds.  (ECF No. 90-3

4    at 20–21.)  As is the case with other exhibits to which Defendants object, there does not appear to

5    be an actual dispute regarding the authenticity of the CAD Response Report because Defendants

6    themselves produced it in discovery.  (*See* Merin Decl. at ¶ 23.)  Regardless, the distinctive

7    characteristics of the contents of the report are sufficient to authenticate it for the purposes of

8    summary judgment.  For example, the report lists a creation date of May 5, 2018, a creation time

9    of 10:27 a.m., and a location of "1201 S 7TH ST, CO MO (COUNTRY GIRL TRUCK STOP)."

10    (ECF No. 83-3 at 308.)  Additionally, the report provides a list of query responses for Alejandro

11    Medina Sanchez.  (*Id.* at 315–18.)

12    Defendants' authentication objection to Exhibit 22 is overruled.

13        **viii.    Exhibit 26: Autopsy report of Dr. Sung-Ook Baik**

14    Defendants object to the admission of Exhibit 26 on grounds of hearsay and foundation.

15    (ECF No. 90-3 at 21–22.)  These objections are without merit.  First, the contents of the report –

16    Dr. Baik's personal observations and medical conclusions – would be admissible at trial through

17    Dr. Baik's testimony.  *See Sandoval*, 985 F.3d at 666.  Moreover, Defendants themselves

18    produced the autopsy in discovery, (Merin Decl. at ¶ 27), and the contents of the report clearly

19    link it to the facts at issue in this case: the report contains Mr. Sanchez's name as well as the date

20    and time of his death.  (ECF No. 83-3 at 344.)

21    Defendants' hearsay and foundation objections to Exhibit 26 are overruled.

22        **ix.    Exhibits 27, 28, and 35: SCSD Policy Manuals**

23    Exhibits 27, 28, and 35 are SCSD's Personnel Complaints policy, Standards of Conduct,

24    and Mental Illness Commitments policy.  Defendants object to the admission of all three

25    documents on the grounds of hearsay, authentication, and improper expert opinion.  (ECF No. 90-

26    3 at 22–23.)  The only objection Defendants clearly articulate, however, is to authentication.  (*See*

27    *id.*)  Plaintiffs assert that they gathered all three policy manuals from the official SCSD website.

28    (Merin Decl. at ¶¶ 28–29, 36.)  Additionally, every page of each exhibit contains a header and

1   footer identifying the documents as portions of the SCSD Policy Manual, "published with

2   permission by Stanislaus County Sheriff's Department." (*See generally* ECF No. 83-3 at 349–56,

3   358–68, 421–25.)

4        Defendants make no substantive hearsay arguments apart from a bare assertion of Federal

5   Rule of Evidence 801 as a ground for objection. Such an argument is insufficient to raise a valid

6   objection. *See Sandoval*, 985 F.3d at 666. Nevertheless, the Court notes that it is far from

7   unreasonable to believe that Plaintiffs could produce the manuals' contents at trial through a

8   witness familiar with the various processes and standards of conduct at SCSD. Moreover, "[t]he

9   court is not inclined to comb through these documents, identify potential hearsay, and determine

10  if an exception applies – all without guidance from the parties." *Burch*, 433 F. Supp. 2d at 1124.

11       Finally, Defendants' assertion regarding the applicability of Federal Rule of Evidence 702

12  is without explanation. The Court cannot discern to which portions of the policies Defendants

13  object on this ground, and it will not indulge such generalized and unspecified objections. *See*

14  *Sandoval*, 985 F.3d at 666.

15       Defendants' hearsay, authentication, and improper expert opinion objections to Exhibits

16  27, 28, and 35 are overruled.

17                                          **V.**

18                    **Requests to Consider Supplemental Authority**

19       Prior to the hearing on this motion, Plaintiffs filed four requests to consider new authority

20  in support of their opposition. (ECF Nos. 86, 95, 97, 103.) The Local Rules permit parties to file

21  "a notice of supplemental authority to bring the Court's attention to a relevant judicial opinion

22  issued after the date that party's opposition or reply was filed." E.D. Cal. R. 230(m)(2). Such a

23  notice "may not contain additional argument on the motion." *Id.*

24       All of Plaintiffs' notices of supplemental authority contain additional argument.

25  Defendants have filed two requests for leave to file responses based on Plaintiffs' violation of the

26  Local Rules. (ECF Nos. 96, 98.) Those requests contain argument regarding the applicability of

27  the supplemental authority. (ECF No. 96 at 2; ECF No. 98 at 2.)

28  ///

1    The Court disapproves of this flurry of unauthorized briefing.  Nevertheless, at the

2    October 28, 2022 hearing on the motion, the Court provided the parties an opportunity to address

3    Plaintiffs' notices of supplemental authority.  In drafting this order, therefore, the Court

4    considered the arguments of both parties.[8]

5                                      **VI.**

6                                   **Discussion**

7    **A.     Claim 1: Excessive Force in violation of the Fourth Amendment, pursuant to 42**

8    **U.S.C. § 1983**

9          Title 42 U.S.C. § 1983 provides a cause of action through which individuals may

10   vindicate "the deprivation of any rights, privileges, or immunities secured by the Constitution and

11   laws" of the United States.  *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir.

12   2006).  To state a claim under § 1983, a plaintiff must allege (1) a violation of a federal right, and

13   (2) that the entity or person committing the violation acted under "color of state law."  *West v.*

14   *Atkins*, 487 U.S. 42, 48 (1988).  Here, there is no dispute that Deputy Defendants acted under

15   "color of state law."  The parties do dispute, however, whether Deputy Defendants violated Mr.

16   Sanchez's federal rights by using excessive force in violation of the Fourth Amendment.

17         Courts analyze claims of excessive force under an objective reasonableness standard.

18   *Graham v. Connor*, 490 U.S. 386, 388 (1989).  This inquiry requires "a careful balancing of 'the

19   nature and quality of the intrusion on the individual's Fourth Amendment interests' against the

20   countervailing governmental interests at stake."  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8

21   (1985)).  In assessing the governmental interest in the use of force, courts consider a non-

22   exhaustive list of factors, including "the severity of the crime at issue, whether the suspect poses

23   an immediate threat to the safety of the officers or others, and whether he is actively resisting

24   arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "Other relevant factors

25   include the availability of less intrusive alternatives to the force employed, whether proper

26   warnings were given and whether it should have been apparent to the officers that the person they

27

28   ---
     [8] Since the hearing on this motion, Plaintiffs have filed four additional notices of supplemental authority.  (ECF Nos. 111–114.)  In compliance with Local Rule 230(m)(2), none of those notices contain any briefing.

1   used force against was emotionally disturbed." *Glenn v. Washington Cnty.*, 673 F.3d 864, 872

2   (9th Cir. 2011).  The most important of these factors is whether the individual posed an

3   "immediate threat to the safety of the officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th

4   Cir. 1994).  The test is an objective one – an officer's good or ill will is irrelevant – and courts

5   must assess an officer's actions "from the perspective of a reasonable officer on the scene, rather

6   than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97.  "Because such balancing

7   nearly always requires a jury to sift through disputed factual contentions, and to draw inferences

8   therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should

9   be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Green v. City*

10   *and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).

11          Even if a court determines that an officer's use of force was excessive, the officer can

12   claim qualified immunity from suit.  "Qualified immunity shields government officials from civil

13   damages liability unless the official violated a statutory or constitutional right that was clearly

14   established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664

15   (2012).  A right is clearly established when "every 'reasonable official would [have understood]

16   that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting

17   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  While it is not necessary to point to a case

18   directly on point, "existing precedent must have placed the statutory or constitutional question

19   beyond debate." *Id.*  This requires courts to define the right at issue with specificity, identifying

20   cases where officers acted "under similar circumstances." *White v. Pauly*, 580 U.S. 73, 79

21   (2017).  Doing so is particularly important in the context of excessive force claims because it is

22   "sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to

23   the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)

24   (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).[9]

---

25   [9] Plaintiffs argue that Deputy Defendants insufficiently pleaded an affirmative defense of qualified immunity in their
26   Answer.  (ECF No. 83 at 21.)  This appears to be a motion to strike, which Plaintiffs should have made within
    twenty-one days of receiving Defendants' Answer.  *See* Fed. R. Civ. P. 12(f)(2).  It is, therefore, untimely.
27   Moreover, "[m]otions to strike are disfavored and infrequently granted." *Neveu v. City of Fresno*, 392 F. Supp. 2d
    1159, 1170 (E.D. Cal. 2005).  Courts should not grant them "unless it is clear that the matter to be stricken could
    have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp.
28   1335, 1339 (N.D. Cal. 1991) (citation omitted).  Consequently, the Court denies any motion to strike affirmative

1    Plaintiffs assert five instances of excessive force in this case: (1) the struggle between Mr.

2    Sanchez and officers that led to Mr. Sanchez falling to the ground; (2) the tight and painful

3    application of handcuffs; (3) the application of "body and head compressions" while Mr. Sanchez

4    was prone on the ground; (4) the use of a defective WRAP device; and (5) the Deputy

5    Defendants' decision to cancel their request for an ambulance.  (ECF No. 83 at 8–12.)  Deputy

6    Defendants dispute that any force they used was excessive and assert that, even if the Court finds

7    excessive force, they are entitled to qualified immunity.  (ECF No. 80-1 at 14–22.)

8         **i.**    **The struggle between Mr. Sanchez and Deputies Babbitt, Rohn, and Day.**

9              **a.**    **There is a dispute of fact regarding the nature and severity of the force**

10                  **Deputies Babbitt, Rohn, and Day used during Mr. Sanchez's fall.**

11    Deputy Defendants argue that they "did not use any force to effectuate a takedown

12   maneuver" of Mr. Sanchez.  (ECF No. 80-1 at 15.)  They acknowledge that Deputies Babbitt,

13   Rohn, and Day grabbed Mr. Sanchez's arms to prevent him from standing but contend that it was

14   the force of Mr. Sanchez's momentum and his efforts to evade the deputies' grasp that brought

15   him to the ground.  (*Id.* at 15–16.)  To support this contention, Deputies Babbitt, Rohn, and Day

16   filed declarations asserting as much.  (ECF No. 80-4 at 6, 13, 18, 23.)

17    Plaintiffs, on the other hand, describe the actions of the deputies as a "gang tackle."  (ECF

18   No. 83 at 16–17.)  This description appears to derive from the statements that Deputies Babbitt,

19   Rohn, and Day supplied during an internal SCSD investigation.  Deputy Babbitt described

20   holding Mr. Sanchez "to maintain control" of him.  (ECF No. 83-3 at 11; Plaintiff Ex. 2 at 7:10–

21   7:28, ECF No. 83-3 at 15 ("Babbitt Video").)  Deputy Rohn stated that the deputies were "*able to*

22   *take* Alejandro to the ground using hands and arms."  (ECF No. 83-3 at 21; Plaintiff Ex. 4 at

23   11:12–11:28, ECF No. 83-3 at 28 ("Rohn Video") (emphasis added).)  Similarly, Deputy Day

24   stated that the deputies "*took* Alejandro from a seated position to the asphalt."  (ECF No. 83-3 at

25   33; Plaintiff Ex. 6 at 5:25–6:00, ECF No. 83-3 at 38 ("Day Video") (emphasis added).)  The

26   Court agrees that these statements indicate a degree of intentionality that is missing from the

27   deputies' declarations.  Additionally, the Court is mindful that Mr. Sanchez is no longer able to

28   _____

defenses in Defendants' Answer.

1    provide his own testimony about the moments leading up to his death.  In cases such as this, "the

2    court may not simply accept what may be a self-serving account by the police officer."  *Scott v.*

3    *Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

4         Both parties acknowledge that the intentionality of the takedown is critical to the

5    excessive force inquiry.  (ECF No. 80-1 at 16–14; ECF No. 83 at 17-18.)  If Mr. Sanchez caused

6    the deputies to fall, the only action that could have implicated the Fourth Amendment would have

7    been the use of hands to prevent Mr. Sanchez from rising from his seat.  Such a de minimis bodily

8    intrusion would likely be reasonable under the Fourth Amendment.  *See Fontana v. Haskin*, 262

9    F.3d 871, 880 (9th Cir. 2001); *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir.

10   2015) ("[F]orce used by an officer to effectuate an arrest, 'regardless of whether [the officer] had

11   probable cause to [make the] arrest,' may still be reasonable, for instance to overcome the

12   arrestee's forcible resistance.") (quoting *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d

13   912, 921–22 (9th Cir. 2001)) (alterations in original).  If the deputies tackled Mr. Sanchez to the

14   ground, however, the Fourth Amendment inquiry would need to be more probing.  *See*

15   *Blankenhorn v. City of Orange*, 485 F.3d 463, 478–79 (recognizing that a gang tackle can be

16   unreasonable depending on the circumstances).  The effect of a take-down in this case would be

17   particularly severe given the nature of Mr. Sanchez's injuries and his resulting death.

18        Deputy Defendants argue that they did not see Mr. Sanchez hit his head on the ground.

19   (DSF at ¶ 14.)  Whether Deputy Defendants saw Mr. Sanchez hit his head, however, is not at

20   issue.  What matters is the effect of the take-down.  *See Rice v. Morehouse*, 989 F.3d 1112, 1121

21   (9th Cir. 2021) (holding that the defendants' "take-down involved a 'substantial' and 'aggressive

22   use' of force" where plaintiff suffered "extreme pain" from falling "face-first onto the

23   pavement"); *Santos v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002) (describing a take-down as

24   "quite severe" where plaintiff suffered broken vertebra).  In this case, the autopsy report indicates

25   that Mr. Sanchez suffered multiple abrasions and bruises on his head and eventually died from a

26   "subarachnoid hemorrhage."  (ECF No. 83-3 at 346–47.)  Viewing the evidence in the light most

27   favorable to Plaintiffs, a jury could conclude that, in employing a take-down maneuver or tackle,

28   Deputies Babbitt, Rohn, and Day slammed Mr. Sanchez's head into the pavement, causing

1  internal bleeding that eventually led to Mr. Sanchez's death.  Whether this is the case or not is in

2  dispute, and a jury must be the final arbiter.

3              **b.      Even assuming Deputies Babbitt, Rohn, and Day employed a take-**

4                       **down maneuver or tackle, there are issues of material fact regarding**

5                       **whether such a tactic was reasonable under the circumstances.**

6         Though they do not admit to using an intentional take-down maneuver, Deputy

7  Defendants appear to argue that any take-down under the circumstances would have been

8  objectively reasonable.  (ECF No. 80-1 at 19–20; ECF No. 90 at 2–4.)  In weighing the

9  governmental interest at stake against the severity of force the deputies used – and viewing the

10 facts in the light most favorable to Plaintiffs – the Court finds that there are too many disputes of

11 material fact to decide the issue at summary judgment.

12        First, the crime at issue in this case was a traffic infraction.  Whether Deputy Babbitt

13 planned to cite Mr. Sanchez for having expired registration or for having a missing license plate,

14 or both, he was addressing a non-violent regulatory offense.  Such a violation "generally will not

15 support the use of a significant level of force."  *Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir.

16 2010); *cf. Rice*, 989 F.3d at 1123 (holding that driving under the influence is not "particularly

17 severe").  Plaintiffs emphasize the gross disparity between the nature of the offense and the

18 Deputy Defendants' conduct, (ECF No. 83 at 17), and the Court agrees that the nature of Mr.

19 Sanchez's crime would support, at most, a de minimis use of force.  This is especially true in light

20 of the fact that it was Mr. Sanchez himself who approached Deputy Babbitt to address

21 irregularities with his vehicle.

22        The conduct immediately precipitating the use of force in this case, however, was not the

23 traffic infraction, but rather, Mr. Sanchez's decision to disobey direct orders to remain seated.

24 The fact of his resistance, however, does not itself support the use of a take-down maneuver.  For

25 example, in *Blankenhorn v. City of Orange*, officers saw the plaintiff in a crowded mall after he

26 had received a notice forbidding his presence on the property.  485 F.3d at 478.  An officer

27 approached the plaintiff, grabbed his arm, and threatened to spray him with mace when the

28 plaintiff yanked his arm away.  *Id.* at 469.  During the interaction, the plaintiff was angry and

24

1   loud, cursed at the officers, and threw his driver's license on the ground.  *Id.*  When told to kneel

2   on the ground so that officers could handcuff him, the plaintiff refused.  *Id.* at 478.  The officers

3   then immediately jumped on the plaintiff and struggled for a few moments before bringing him to

4   the ground.  *Id.*  The Court of Appeals found that none of the plaintiff's conduct constituted an

5   active attempt to resist arrest.  *Id.* at 478–79.

6          Mr. Sanchez's conduct is similar to, and in several ways less egregious, than that in

7   *Blankenhorn*.  Unlike the plaintiff in *Blankenhorn*, Mr. Sanchez was the one to approach officers.

8   He also complied with Deputy Babbitt's initial orders to sit down.  These two facts indicate an

9   intention to remain in the area while the deputies conducted their investigation.  Like the plaintiff

10  in *Blankenhorn*, Mr. Sanchez then offered slight resistance – he stood up and attempted to pull

11  away when multiple deputies grabbed him.  This conduct, however, does not necessarily indicate

12  an attempt to evade arrest or even to leave the scene.  None of the deputies had informed Mr.

13  Sanchez that he was under arrest.  *Cf. Glenn*, 673 F.3d at 864 ("[W]arnings should be given,

14  when feasible, if the use of force may result in serious injury."); *Andrews v. City of Henderson*,

15  35 F.4th 710, 717 (9th Cir. 2022) (holding that the lack of a warning is relevant to assessing the

16  government's interest in using force).  His resistance may have been the product of fear and

17  confusion in the face of multiple officers physically restraining him during an investigation into

18  his expired registration.  The Court, therefore, does not find that standing up was a significant act

19  of resistance.  Determining the full extent of Mr. Sanchez's resistance, however, is a job for a

20  jury, not the Court at summary judgment.

21          It is also important for the Court to consider Mr. Sanchez's conduct in the context of his

22  other erratic behavior.  "[W]here it is or should be apparent to the officers that the individual

23  involved is emotionally disturbed," courts should consider that fact in determining whether a use

24  of force was reasonable.  *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).  The

25  government's interest in using force against an "emotionally disturbed individual," even one who

26  is acting out, is less than its interest in using force against someone "who has committed a serious

27  crime against others."  *Id.*

28  ///

1    Plaintiffs point out that Deputy Defendants noted Mr. Sanchez's unusual behavior almost

2    from the outset of their interaction with him, and that they should have been on notice that Mr.

3    Sanchez suffered from mental illness.  (ECF No. 83 at 17.)  Deputy Defendants argue that Mr.

4    Sanchez's mental health status is immaterial because his behavior was consistent with drug use.

5    (ECF No. 90 at 3.)  Deputy Defendants' position draws too fine of a line, ignoring both Ninth

6    Circuit case law and undisputed facts in this case.  Intoxication and mental illness are not

7    mutually exclusive conditions, and they often appear in tandem.  *See, e.g.*, *Santos*, 287 F.3d at

8    848–49 (describing diagnosed paranoid schizophrenic who drank a cup and a half of whiskey for

9    breakfast, had traces of amphetamines in his system, and was seen walking erratically and

10   screaming as "behaving in an emotionally or mentally disturbed manner"); *Deorle*, 272 F.3d at

11   1275–76, 1280 (9th Cir. 2001) (describing plaintiff who drank half a pint of vodka along with his

12   medication and began screaming and banging his head against the wall as "deeply troubled" and

13   "emotionally disturbed").  California law recognizes this intersection of drug use and mental

14   health.  California Welfare and Institutions Code section 5150 permits officers to detain someone

15   if they have probable cause to believe that the individual, "as a result of a mental health disorder,

16   is a danger to others, or to themselves, or [is] gravely disabled . . . ."  Cal. Welf. & Inst. Code §

17   5150.  The language of section 5150 forecloses the ability of officers to detain individuals based

18   on the fact of intoxication alone, but erratic behavior and irrational statements that are a product

19   of intoxication could provide probable cause to believe the individual suffers from a mental

20   health disorder justifying a 5150 hold.  *See S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1011 n.1

21   (9th Cir. 2017) ("5150 is a well-recognized code for a person who is potentially a danger to

22   themselves or others due to mental illness and/or being under the influence of alcohol or drugs.").

23   In fact, Deputy Rohn discussed the possibility of detaining Mr. Sanchez pursuant to section 5150

24   because he was acting "crazy," indicating an awareness that Mr. Sanchez was in some way

25   suffering from a mental health disorder.  (*See* ECF No. 83-3 at 21.)

26   Deputy Defendants are correct to point out that it is Mr. Sanchez's behavior at the time of

27   the incident, rather than the exact nature of his mental health status, that is relevant to the Court's

28   analysis.  (*See* ECF No. 90 at 3.)  Their citation to *Weiland v. City of Concord*, No. 13-cv-5570-

1    JSC, 2014 WL 538756 (N.D. Cal. Oct. 20, 2014), however, misses the point. *Weiland* involved a

2    discovery dispute where the plaintiff in an excessive force case sought to avoid turning over his

3    mental health records to the defense. *Id.* at *1. The Court held that the documents were not

4    relevant to the proceedings because the defendant officer could "offer no more than mere

5    speculation that Plaintiff's mental health condition factored into the underlying incident." *Id.* at

6    *4. Notably, while the officer believed the plaintiff had been drunk, there was no indication that

7    he had behaved erratically during the interaction. *Id.* Mr. Sanchez's behavior distinguishes this

8    case dramatically from *Weiland*. Both sides present evidence describing an individual who was

9    acting erratically and speaking nonsensically from the moment he began interacting with the

10   deputies. Issues with Mr. Sanchez's mental health should have been apparent to Deputy

11   Defendants prior to Mr. Sanchez's decision to stand.

12        Deputy Defendants argue that two cases involving mentally ill plaintiffs – *Deorle v.*

13   *Rutherford* and *Vos v. City of Newport Beach* – are distinguishable from Mr. Sanchez's case and

14   counsel against placing too much weight on Mr. Sanchez's mental health in the excessive force

15   calculus. (ECF No. 90 at 3.) In *Deorle*, the plaintiff's wife called 911 after the plaintiff "lost

16   control of himself" and began screaming and banging his head against the wall. 272 F.3d at

17   1276. When officers arrived, the plaintiff complied with instructions but was verbally abusive

18   and shouting at the officers to kill him. *Id.* At various points, he brandished a hatchet, roamed

19   around his property with an unloaded crossbow and can of lighter fluid, and screamed at an

20   officer that he would "kick his ass." *Id.* at 1276–77. After dropping any weapons in his

21   possession, the plaintiff began walking toward an officer, who, without warning, shot the plaintiff

22   in the eye with a beanbag round. *Id.* at 1278. The officer had an opportunity to observe the

23   plaintiff for five to ten minutes before shooting him and had previously consulted with other

24   officers on scene. *Id.* at 1277. The Court of Appeals held that the officer's use of force was

25   excessive, considering, among other factors, the number of officers on scene, the plaintiff's

26   compliance with commands, the absence of a physical assault, and the lack of any warning before

27   the officer fired at the plaintiff. *Id.* Additionally, the court held that considering the plaintiff's

28   mental health status was relevant to determining the reasonableness of the officer's use of force.

1    *Id.* at 1283.  Nevertheless, the court refused to announce a "per se rule" mandating courts to give

2    particular weight to an individual's mental health.  *Id.* at 1283.

3           In *Vos*, the visibly agitated plaintiff ran around a convenience store wielding a pair of

4    scissors and shouting at patrons.  892 F.3d at 1028.  At least eight officers arrived and stood

5    outside for twenty minutes while people left the store.  *Id.* at 1029–30.  Officers could hear the

6    plaintiff inside yelling and telling officers to shoot him.  *Id.* at 1029.  At one point, the plaintiff

7    ran out the front door with an object held overhead.  *Id.*  Disregarding orders to drop the object,

8    the plaintiff charged at officers, who shot and killed him.  *Id.*  While only eight seconds elapsed

9    between the plaintiff's approach and the officers' shots, the officers "had upwards of 15 minutes

10   to create a perimeter, assemble less-lethal means, coordinate a plan for their use of force,

11   establish cover, and arguably, try to communicate with [the plaintiff]."  *Id.* at 1034.  The Court of

12   Appeals held that summary judgment was inappropriate because, among other considerations, a

13   jury could find that the plaintiff did not present an immediate threat to officers who held

14   established positions behind their cruisers, outnumbered the plaintiff eight-to-one, and could have

15   employed less lethal means of stopping the plaintiff.  *Id.* at 1032–33.  The court also held that the

16   plaintiff's "indications of mental illness create[ed] a genuine issue of material fact about whether

17   the government's interest in using deadly force was diminished."  *Id.* at 1034.

18          In distinguishing these cases, Deputy Defendants state, "[h]ere, the sudden resistance was

19   only after an attempt to detain was made."  (ECF No. 90 at 3.)  The import of this statement is

20   unclear to the Court.  To the extent that Deputy Defendants argue that Mr. Sanchez's mental

21   health was not a factor because they only noticed it in the moment he decided to stand up, the

22   evidence from both sides firmly contradicts such an assessment.  A more charitable reading of

23   Deputy Defendants' argument is that Mr. Sanchez's "sudden resistance" placed Deputy

24   Defendants in more imminent danger than the plaintiffs in *Deorle* and *Vos*.  This is, however, an

25   argument about the proper balancing of factors in assessing the reasonableness of Deputy

26   Defendants' use of force in taking Mr. Sanchez to the ground.  The differences between this case

27   and *Deorle* and *Vos* does not negate the fact that Mr. Sanchez's mental health was an apparent

28   factor relevant to the Court's analysis.

1    This brings the Court to the most important inquiry: whether Mr. Sanchez posed an

2    immediate threat to Deputy Defendants or others prior to the moment Deputy Defendants took

3    him to the ground.  Deputy Defendants argue that their actions occurred under "circumstances

4    that were 'tense, uncertain, and rapidly evolving.'"  (ECF No. 80-1 at 15 (quoting *Graham*, 490

5    U.S. at 396–97).)  They never argue explicitly that Mr. Sanchez posed a threat but state that he

6    stood up abruptly while screaming and resisting attempts to gain control of his movements.  (*Id.*

7    at 16; ECF No. 90 at 2.)  This information does not render Deputy Defendants' actions inherently

8    reasonable.  There is no evidence that Mr. Sanchez made any threats, carried any weapons,

9    clenched his fists, or made any aggressive movements toward the deputies on scene.  Deputy

10   Defendants repeatedly state that Mr. Sanchez screamed at them.  (ECF No. 80-1 at 15–16.)  The

11   evidence, on the other hand, demonstrates that Mr. Sanchez was screaming into his cell phone

12   that Deputy Defendants were trying to kill him.  (*See, e.g.*, ECF No. 83-3 at 21.)  Not only is it

13   unclear whether Mr. Sanchez directed his screams at any particular party, but his conduct

14   appeared to signal mental illness rather than aggression.

15   Contrary to Deputy Defendants' argument, comparing Mr. Sanchez's conduct with the

16   plaintiffs in *Deorle* and *Vos* is instructive.  In *Deorle*, the plaintiff told at least one officer that he

17   would "kick his ass" and, at various times, wielded weapons.  272 F.3d at 1276–77.  In *Vos*, the

18   plaintiff injured a bystander with a pair of scissors and charged officers with an unknown object

19   held overhead.  892 F.3d at 1029.  No evidence of similar aggression exists in this case to justify

20   the use of a take-down or tackle.  To the extent Deputy Defendants argue that Mr. Sanchez's

21   abrupt rise was aggressive, that is a question of fact for a jury to assess.

22   Therefore, even assuming that Deputies Babbitt, Rohn, and Day employed a take-down

23   maneuver or tackle, they have not carried their burden of demonstrating an absence of a dispute

24   of material fact regarding the reasonableness of their conduct under the circumstances.

25   **c.**      **Deputies Babbitt, Rohn, and Day are not entitled to qualified**

26   **immunity for the alleged take-down.**

27   Deputy Defendants argue that, even if they employed an intentional take-down maneuver,

28   they are nevertheless entitled to qualified immunity.  (ECF No. 80-1 at 19.)  They point to several

29

1    cases where courts have found "controlled" take-downs lawful when "an arrestee resists arrest or

2    presents an immediate threat." (*Id.*)  As Plaintiffs point out, the primary issue with Deputy

3    Defendants' argument is their portrayal of a "controlled takedown maneuver." (*See* ECF No. 83

4    at 21 (quoting ECF No. 80-1 at 19–20).)  Whether a take-down occurred, much less whether it

5    was a controlled take-down, is a material dispute of fact.  In fact, Deputy Defendant's assertion

6    that any take-down maneuver must have been controlled is at odds with their contention that Mr.

7    Sanchez's own momentum caused him to tumble to the ground with three deputies in tow.

8            Moreover, the controlled take-down cases that Defendants cite are inapposite.  In

9    *Sheridan v. Trickey*, No. 10-06034-AC, 2010 WL 5812678, at *1 (D. Or. Dec. 16, 2010), the

10   defendant officer drove by the plaintiff, who was shirtless, yelling, holding his middle finger up

11   to the officer's patrol car, and matched the description of a burglary suspect.  The officer pulled

12   over to speak with the plaintiff, who appeared to be intoxicated and became "aggressive and

13   confrontational." *Id.*  As he came within six feet of the officer, the plaintiff assumed a "fighting

14   stance." *Id.*  The officer told the plaintiff to turn around, and the plaintiff began walking toward a

15   running car parked nearby. *Id.* at *2.  Afraid the plaintiff would try to escape or retrieve a

16   weapon, the officer told the plaintiff to stop, grabbed his arm, and pinned him against the car.  *Id.*

17   The officer told the plaintiff that he was under arrest and to stop resisting.  *Id.*  A struggle ensued,

18   and the officer used a takedown maneuver to gain control of the plaintiff.  *Id.*  Because the

19   plaintiff was shirtless and sweaty, the officer lost his grip.  *Id.*  The plaintiff hit his head on the

20   pavement and was knocked unconscious.  *Id.*

21           In *Gregory v. County of Maui*, 523 F.3d 1103, 1104–05 (9th Cir. 2008), officers

22   responded to reports of the plaintiff acting erratically and shoving and hitting people.  When they

23   arrived, they saw the plaintiff appearing "high strung, excitable and jumpy" and holding a pen

24   with the tip pointed at the officers.  *Id.* at 1105.  The plaintiff refused multiple orders to put down

25   the pen, at which point, the officers initiated a controlled take-down.  *Id.*  Though the take-down

26   did not result in any physical injuries, the plaintiff died on-scene from a heart attack.  *Id.*  An

27   autopsy revealed that the plaintiff suffered from severe heart disease and that his marijuana use

28   likely contributed to the heart attack.  *Id.*

Unlike the plaintiffs in *Sheridan* and *Gregory*, Mr. Sanchez never actively threatened officers. While it is undisputed that he began to scream, he did not direct those screams at the officers or assume a fighting stance like the plaintiff in *Sheridan*. Nor did he ever wield a weapon, like the plaintiff in *Gregory*. Moreover, unlike the plaintiffs in both *Sheridan* and *Gregory*, Mr. Sanchez was the one to initiate contact with officers and complied with initial orders from them to sit down. The crime that the deputies were investigating was also entirely non-violent and non-serious, unlike the alleged burglary in *Sheridan* and the reports of assault in *Gregory*. Finally, the results of Mr. Sanchez's take-down, unlike those in *Sheridan* and *Gregory*, are still in dispute. Viewing the facts in the light most favorable to Plaintiffs, a jury could conclude that the take-down in this case resulted in a head injury that led to Mr. Sanchez's death. Such a result would be far more serious than the non-lethal injury in *Sheridan* and far more proximate than the drug- and heart disease-associated cardiac arrest in *Gregory*.

Plaintiffs' citations, on the other hand, are more apt. They demonstrate that, at the time of the incident, the use of a take-down was clearly excessive when the individual offered minimal resistance, had not directly threatened officers, and had not committed a serious crime. *See Blankenhorn*, 485 F.3d at 481; *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003); *Santos*, 287 F.3d 853–55. Based on the facts that the parties have presented, the Court cannot find that Deputies Babbitt, Rohn, and Day are entitled to qualified immunity for the alleged take-down or tackle of Mr. Sanchez.

Deputy Defendants' motion for summary judgment is, therefore, denied as it relates to Deputies Babbitt, Rohn, and Day. Because there is no evidence that Deputies Camara, Knittel, Poust, and Longoria participated in the alleged take-down, the motion for summary judgment is granted as to them.

**ii.     Deputy Defendants' use of body and head compressions while Mr. Sanchez lay prone on the ground.**

**a.     The severity of the force used is a disputed fact.**

Deputy Defendants state that once Mr. Sanchez was prone on the ground, they applied "partial body weight" to his "arms, shoulders, back and legs." (ECF No. 80-1 at 17.) Plaintiffs

31

1    point out that Deputy Defendants estimated that the amount of force they applied to Mr.

2    Sanchez's body was between 550 and 600 pounds.  (ECF No. 83.)  They also argue that Deputy

3    Defendants placed at least some of this pressure on Mr. Sanchez's head and that the compressions

4    resulted in his inability to breathe.  (*Id.*)  The Court first notes that Deputy Defendants' statements

5    about the use of partial pressure is consistent with Plaintiffs' assertion about the amount of

6    pressure on Mr. Sanchez's body.  All seven Deputy Defendants at one point participated in

7    physically restraining Mr. Sanchez, and at least three of them have asserted that they weigh over

8    200 pounds.  The question is not how much of their bodyweight they placed on Mr. Sanchez, but

9    rather the amount of force they leveraged into keeping his body on the ground.  The Court also

10   notes that it appears to be undisputed that at least one deputy placed some amount of pressure on

11   Mr. Sanchez's head and neck while restraining him.  (ECF No. 83-3 at 12 ("[T]here were hands

12   near the back of Alejandro's neck while the shoulder harness was being applied, but nothing to

13   the front of his neck or throat."); *id.* at 22 ("[T]hey eventually pin Alejandro's head down in order

14   to gain compliance."); Poust Decl. at ¶ 5 ("I briefly placed a portion of my knee on Alejandro

15   Sanchez's head to get him to stop moving so that the Wrap restraint could be properly applied.");

16   Longoria Decl. at ¶ 6 ("I assisted in briefly pushing Alejandro Sanchez's neck/upper back

17   forward to get the upper harness of the Wrap restraint device around his torso.").)

18          Therefore, the only factual dispute regarding the amount of force Deputy Defendants used

19   is whether it was sufficient to make it difficult for Mr. Sanchez to breathe.  An eyewitness

20   described Mr. Sanchez as looking "lifeless" with his mouth open and eyes rolled back in his head.

21   (Deposition of Alex Perez at 14:14–17, ECF No. 83-3 at 267 ("Perez Depo."); *see also id.* at

22   20:23–25 ("I even told my dad, I was, like, 'Wow, that dude looked dead.'").)  He also thought

23   that Mr. Sanchez's struggling appeared to be an attempt to breathe rather than a sign of

24   aggression.  (*Id.* at 21:22–23:4.)  Plaintiffs have also submitted an expert report concluding that

25   Mr. Sanchez was trying to breathe and experiencing "air hunger." [10]  (ECF No. 83-3 at 47–48.)

26   ///

---

27   [10] Deputy Defendants urge the Court to ignore Dr. Spitz's expert report.  (ECF No. 90 at 6–7.)  Their only argument
     regarding Dr. Spitz's report, however, is a reprisal of evidentiary objections that the Court has already overruled in
28   this order.  (*See id.* at 6.)

1    This conclusion is consistent with Ninth Circuit case law, which has recognized that

2    pressing an individual face first into the ground is "capable of causing death or serious injury"

3    and that "prone and handcuffed individuals in an agitated state have suffocated under the weight

4    of restraining officers."  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–

5    57 (9th Cir. 2003); *see also Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal.

6    2016) ("Where officers apply approximately eight to ten minutes of body-weight pressure to a

7    suspect's back, under *Drummond*, the conduct as alleged constitutes lethal force.").  It is also

8    consistent with Mr. Sanchez's screams for help as he lay under multiple officers.  Based on the

9    expert's report and the witness's statement, the Court finds that Plaintiffs have raised a dispute of

10   fact regarding the severity of the force Deputy Defendants used to restrain Mr. Sanchez while he

11   was prone on the ground.

12          **b.        There remains a dispute of fact regarding whether Deputy Defendants'**

13                   **conduct was sufficiently provocative to justify any resistance Mr. Sanchez**

14                   **provided.**

15          Even assuming that Deputy Defendants applied force sufficient to make it difficult for Mr.

16   Sanchez to breathe, the Court must still determine whether such force was reasonable under the

17   circumstances.  Deputy Defendants argue that the force they used was reasonable because Mr.

18   Sanchez appeared to be under the influence of drugs, continued to resist physically, refused to

19   obey commands, bit Deputy Babbitt, and attempted to grab Deputy Rohn's taser.  (ECF No. 80-1

20   at 17.)  Plaintiffs argue that any resistance from Mr. Sanchez was justified as an attempt to

21   breathe.  (ECF No. 83 at 18–19.)  They also assert that "Deputy Babbitt only discovered and told

22   others that he had a bruise on his arm at the hospital, suggesting the Deputies' coordination of a

23   *post hoc* justification."  (*Id.* at 19 n.12.)

24          Once Deputy Defendants began to struggle with Mr. Sanchez on the pavement, the parties

25   could arguably claim that the crime in question had turned into a form of resisting arrest.  It is

26   undisputed that Mr. Sanchez continuously pulled his hands away while Deputy Defendants tried

27   to handcuff him.  In fact, Deputy Babbitt told the investigating officer that he planned to book

28   Mr. Sanchez for resisting arrest and a violation of California Penal Code section 69 because both

1    he and Deputy Day suffered injuries.  (ECF No. 83-3 at 12.)  Deputy Babbitt did not specify the

2    Penal Code section for resisting arrest, but the Court assumes he was referring to Penal Code

3    section 148(a), which is a nonviolent misdemeanor offense.  *See Garlick*, 167 F. Supp. 3d at

4    1148.  Penal Code section 69, however, prohibits the use of "any threat or violence" while

5    resisting an officer, and can be charged as either a misdemeanor or felony.  Cal. Pen. Code §

6    69(a).  Section 69 is not inherently a serious crime.  *See Deorle*, 272 F.3d at 1281 (citing Cal.

7    Pen. Code § 69) ("Ultimately, Deorle was charged with nothing more than obstructing the police

8    in the performance of their duties.").  Moreover, for conduct to be criminal under section 69, "an

9    officer must be acting lawfully when the resistance occurs."  *People v. Sibrian*, 207 Cal. Rptr. 3d

10   428, 433 (Cal. Ct. App. 2016).  "An officer using excessive force is not acting lawfully."  *Id.*

11          Viewing the facts in the light most favorable to Plaintiffs, a jury could conclude that Mr.

12   Sanchez's struggling was either the product of his attempts to breathe or a reaction to Deputy

13   Defendants' use of excessive force in tackling him to the ground without warning.  In fact, these

14   characterizations of Mr. Sanchez's conduct are not mutually exclusive.  Additionally, there is no

15   allegation that Mr. Sanchez made any threats.  Rather, both parties appear to agree that, while on

16   the pavement, Mr. Sanchez repeatedly screamed that Deputy Defendants were trying to kill him.

17   Finally, the injuries that Deputies Babbitt and Day suffered were relatively minimal.  Deputy Day

18   cut his hand on handcuffs.  Though this may have been a product of Mr. Sanchez's movement, it

19   was clearly not intentional.  The same cannot necessarily be said about Deputy Babbitt's injury,

20   which resulted in a bruise on the inside of the deputy's left forearm.  Nevertheless, the images of

21   Deputy Babbitt's bruise show no blood, broken skin, or even teeth marks.  The Court cannot say

22   that such an injury would constitute a violation of section 69 if Mr. Sanchez delivered it in

23   response to a use of excessive force.  In short, there remains a dispute of fact regarding the

24   severity of the crime leading to Deputy Defendants' use of force while restraining Mr. Sanchez

25   on the pavement.  The same dispute impacts the Court's ability to consider a separate factor in the

26   excessive force analysis: to what degree Mr. Sanchez was resisting or attempting to evade arrest.

27          Understandably, Deputy Defendants focus on the threat that Mr. Sanchez's conduct posed.

28   They dispute the relevance of Plaintiffs' citation to *Drummond ex rel. Drummond v. City of*

1   *Anaheim*, which held that "squeezing the breath from a compliant, prone, and handcuffed

2   individual despite his pleas for air involves a degree of force that is greater than reasonable."

3   (ECF No. 90 at 4; ECF No. 83 at 18 (quoting *Drummond*, 343 F.3d at 1059).)  The Court agrees

4   with Deputy Defendants that this case is distinguishable from *Drummond*.  In *Drummond*, a

5   neighbor called the police because the plaintiff, who had a known history of hallucination and

6   paranoia, was darting into traffic.  343 F.3d at 1054.  An officer knocked the plaintiff to the

7   ground and handcuffed him.  *Id.*  Two officers used their knees – one on the plaintiff's back and

8   the other on his neck – to hold the plaintiff prone on the ground.  *Id.*  The plaintiff offered no

9   resistance but repeatedly stated that he could not breathe.  *Id.*

10          Unlike the plaintiff in *Drummond*, Mr. Sanchez struggled while on the ground.  Multiple

11   deputies describe him lifting them off the ground with a push-up motion.  Officers were also

12   unable to handcuff him as he drew his arms beneath his body.  These differences, however, do not

13   necessarily render the use of force in this case reasonable.  *See Lombardo v. City of St. Louis*, 141

14   S. Ct. 2239, 2241–42 (2021) (holding that the use of a prone restraint is not *per se* reasonable

15   when a suspect resists officers' attempts to subdue him).  The fact that Mr. Sanchez drew his

16   hands beneath his body, whether it was to avoid handcuffing or to help himself breathe, does not

17   justify the use of substantial force in the absence of threats or violence.  *See Smith v. City of*

18   *Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) ("Although it is true that until both of his arms were

19   handcuffed, Smith continued to shield one arm from the officers and their dog and to shout

20   expletives at the officers, considering the evidence in the light most favorable to him, a rational

21   jury could very well find that he did not, at any time, pose a danger to the officers or others.");

22   *Garlick*, 167 F. Supp. 3d at 1151 (describing elbowing and pulling away from an officer as a

23   "brief response to pain stimulus").  Here, there is no indication that Mr. Sanchez ever threatened

24   officers, held any weapons, or acted aggressively.  In fact, Defendants refer to Mr. Sanchez's

25   movements as "defensive."  (*See* ECF No. 90 at 5.)  Arguably, the fact that Mr. Sanchez reached

26   for Deputy Rohn's taser could constitute a threat of harm.  Mr. Sanchez never, however, removed

27   the taser from the deputy's belt.  Additionally, the deputy's use of force – grabbing and squeezing

28   Mr. Sanchez's wrist until he let go of the taser – was likely reasonable under the circumstances.

1    Moreover, the Ninth Circuit has held that "an officer's 'provocative conduct' can trigger an

2    individual's 'limited right to offer reasonable resistance.'"  *Young v. Cnty. of Los Angeles*, 655

3    F.3d 1156, 1164 (9th Cir. 2011) (quoting *Arpin*, 261 F.3d at 921).  As discussed above, whether

4    Deputy Defendants' conduct was provocative is a question of fact for a jury to decide.

5                    **c.      The Court cannot grant qualified immunity because too many factual**

6                            **disputes remain.**

7            Deputy Defendants argue that it was not clearly established at the time that "placing a

8    resistant suspect in the prone position and applying weight to his arms, ankles, and leg holds was

9    unconstitutional."  (ECF No. 80-1 at 20.)  They point to two cases, *Tatum v. City and County of*

10   *San Francisco*, 441 F.3d 1090 (9th Cir. 2006) and *Estate of Phillips v. City of Milwaukee*, 123

11   F.3d 586 (7th Cir. 1997) – in support of this proposition. (*Id.*)

12           In *Tatum*, an officer saw the plaintiff kicking the door of a police station.  441 F.3d at

13   1092.  Despite the officer's protestations and questions, the plaintiff persisted and refused to

14   speak.  *Id.*  Believing the plaintiff was under the influence, the officer decided to handcuff him.

15   *Id.* at 1093.  The plaintiff spun out of the way as the officer attempted to apply the handcuffs and

16   told him to stop resisting.  *Id.*  The officer then pushed the plaintiff against a wall and used a "bar

17   arm control" to force the plaintiff to the ground.  *Id.*  The plaintiff was prone on the ground for

18   about a minute before officers turned him on his side.  *Id.*  The Court of Appeals held that there

19   was no "evidence that any officer applied crushing pressure to [the plaintiff's] back or neck as he

20   lay prone."  *Id.* at 1098.  The court concluded that it was objectively reasonable to lay a suspect

21   "on his stomach for approximately ninety seconds under the circumstances of the arrest."  *Id.*

22           Deputy Defendants' citation to *Tatum* is problematic: the court's holding applies only to

23   the act of laying a handcuffed suspect on his or her stomach for approximately ninety seconds.

24   The opinion is entirely silent about whether officers applied any pressure at all to the plaintiff

25   while he was on the ground.  Moreover, the plaintiff was prone for far less time than Mr. Sanchez

26   was in this case.  Therefore, the Court does not find that *Tatum* clearly established that their

27   conduct was constitutional.

28   ///

                                                        36

1    Nor does *Estate of Phillips* aid Deputy Defendants. There, officers responded to a report

2    of the decedent acting erratically, trespassing, and destroying furniture in an apartment. 123 F.3d

3    at 588. While facing the officers, the decedent brandished a ballpoint pen in each hand, refusing

4    to release them even after officers had grabbed his arms. *Id.* As the decedent became

5    increasingly volatile, officers brought him to the floor, where they handcuffed him in a prone

6    position. *Id.* at 589. One officer placed her knee lightly on the decedent's right shoulder blade

7    for about one minute to keep him from turning over. *Id.* While on the floor, the decedent

8    attempted to reach into his back pockets, where officers discovered two dinner forks. *Id.*

9    Although the decedent eventually stopped breathing and died the next day, the Seventh Circuit

10   held that the officers' conduct did not constitute deadly force and was reasonable under the

11   circumstances. *See id.* at 593–94.

12   While the amount of force used in *Estate of Phillips* is greater than that in *Tatum*, it is still

13   far less than the amount of force Deputy Defendants employed on Mr. Sanchez. *Estate of*

14   *Phillips* involved a single officer lightly placing her knee on the decedent's shoulder for about a

15   minute. 123 F.3d at 589. Mr. Sanchez had at least seven officers compressing various portions of

16   his body, including his neck and head, for five to ten minutes. One of those officers estimated

17   that the combined weight on Mr. Sanchez's body was between 550 and 600 pounds. Unlike the

18   decedent in *Estate of Phillips*, Mr. Sanchez never wielded or had access to an object that he could

19   have used as a weapon. The facts of *Estate of Phillips* are simply too different for them to be

20   relevant in this case.

21   Plaintiffs proffer several cases as evidence that prolonged compressions to an individual's

22   back, neck, and head was a clearly established violation of the Fourth Amendment.[11] (ECF No.

23   83 at 22.) Deputy Defendants point out that these cases are distinguishable because they involve

24   plaintiffs who had stopped resisting and were otherwise disabled while officers applied force to

25   them. (*See* ECF No. 90 at 8). Deputy Defendants are correct to an extent. *See Drummond*, 343

26   F.3d at 1054 (describing officers who placed their knees on plaintiff's back and neck even though

27   

28   [11] Plaintiffs cite to a number of unpublished opinions, which courts may consider in determining whether a right was clearly established. *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004).

1  plaintiff "offered no resistance"); *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1075–76 (9th Cir.

2  2017) (describing officer who shot decedent four times and stomped on his head three times while

3  decedent was curled up on his side, wounded, and not making threatening gestures); *Slater v.*

4  *Deasey*, 789 Fed. App'x 17, 21 (quoting *Drummond* in describing the clearly established right

5  that prohibits "squeezing the breath from a compliant, prone, and handcuffed individual"); *Zelaya*

6  *v. Las Vegas Metro. Police Dep't*, 682 Fed. App'x 565, 567 (9th Cir. 2017) (noting that decedent

7  was handcuffed and stopped resisting while officers continued to pin him with their bodies);

8  *Abston v. City of Merced*, 506 Fed. App'x 650, 652 (9th Cir. 2013) (noting that decedent was

9  handcuffed and shackled and "was in no position to offer any meaningful resistance"); *Greer v.*

10  *City of Hayward*, 229 F. Supp. 3d 1091, 1097 (N.D. Cal. 2017) (noting that officers continued to

11  apply pressure for a minute after plaintiff appeared to lose consciousness).  Their analysis,

12  however, ignores several key facts.

13       First, Mr. Sanchez's resistance alone is not dispositive.  *See Tucker v. Las Vegas Metro.*

14  *Police Dep't*, 470 Fed. App'x 627, 629 (9th Cir. 2012) ("Keith, unlike Drummond, continued to

15  resist the officers after handcuffs were applied, but this distinction does not, by itself, suffice to

16  bring this case out of Drummond's orbit."); *see also Davis v. City of Las Vegas*, 478 F.3d 1048,

17  1052, 1057 (9th Cir. 2007) (refusing to grant qualified immunity where officer pressed knee into

18  handcuffed and struggling plaintiff).  Additionally, the deputies remained on top of Mr. Sanchez

19  even after they handcuffed him.  The Court cannot discern any facts in the record to indicate how

20  long after handcuffing, Mr. Sanchez remained prone and restrained on the pavement.  This is a

21  material fact for a jury to consider given that courts have found excessive force based on little

22  more than a minute of pressure applied to a prone and handcuffed suspect.  *See, e.g.*, *Abston*, 506

23  Fed. App'x at 652.

24       Deputies Rohn, Babbitt, Day, and Camara applied pressure to Mr. Sanchez for a period of

25  time before they handcuffed him.  The Court cannot, however, view this portion of their

26  interaction with Mr. Sanchez in a vacuum.  As discussed above, there is a dispute of fact

27  regarding whether, and to what extent, Deputies Rohn, Babbitt, and Day provoked Mr. Sanchez's

28  reaction.  There is also a dispute regarding whether Mr. Sanchez's conduct even constituted

38

resistance or whether it was an attempt to breathe.  It would have been clearly established to Deputies Rohn, Babbitt, and Day that it violated Mr. Sanchez's Fourth Amendment rights to tackle him without warning and proceed to restrain him prone on the pavement with pressure on his arms, legs, back, and head.  Similarly, while Deputy Camara did not participate in the alleged tackling, he observed it and participated in the subsequent struggle to pin Mr. Sanchez's body to the pavement.

Deputy Defendants contend that Deputies Knittel, Longoria, and Poust are entitled to qualified immunity because they were "mere bystanders" who were minimally involved in restraining Mr. Sanchez.  (ECF No. 80-1 at 21.)  Even if the conduct of individual officers does not rise to the level of a constitutional violation, they can nevertheless be liable under § 1983 based on their "integral participation" in an alleged violation.  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (quoting *Blankenhorn*, 485 F.3d at 481 n.12).  An officer is an integral participant if they have "some fundamental involvement in the conduct that allegedly caused the violation."  *Blankenhorn*, 485 F.3d at 481 n.12.  An officer's presence as a "mere bystander" is insufficient for liability under § 1983 to attach.  *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996).

Deputies Longoria and Poust were no mere bystanders.  When they arrived on scene, they pressed down on Mr. Sanchez's head and neck before the application of the WRAP device. While they describe their involvement as "brief," the use of such a vague term cannot entitle them to qualified immunity.  Even brief compression on the head and neck of a prone and handcuffed individual who was already under 550-600 pounds of pressure could constitute excessive force. Nor can the Court make an accurate determination of just how brief their involvement was based on the lack of evidence before it.

While Deputy Knittel's participation was less involved, he was nevertheless an integral participant in restraining Mr. Sanchez.  Deputy Knittel arrived on scene before officers had secured Mr. Sanchez in handcuffs and placed his knee on Mr. Sanchez's thigh for about thirty seconds before heading off to retrieve the WRAP restraint.  He noticed that the WRAP he grabbed from Deputy Day's car was defective and went to Deputy Rohn's car to grab an extra

1  ankle strap, extending the time – to an unknown degree – that the other deputies remained on top

2  of Mr. Sanchez.  While thirty seconds is not a significant period of time, the Court's focus is on

3  Deputy Knittel's overall participation, not just the small amount of time he actually touched Mr.

4  Sanchez's body.  Because he not only participated in the compressions, but actively aided in

5  continuing the restraint of Mr. Sanchez, he is not entitled to qualified immunity.

6         The Court finds that there remain significant disputes of fact that prevent the Court from

7  granting qualified immunity to any of Deputy Defendants for their role in restraining Mr. Sanchez

8  while he was prone on the pavement.  Therefore, the motion for summary judgment is denied.

9         **iii.      Whether the tightness of Mr. Sanchez's handcuffs was reasonable under the**

10                **circumstances remains a disputed fact.**

11        Plaintiffs argue that Deputy Defendants' handcuffing of Mr. Sanchez was excessive

12  because Deputy Day later stated that one of the handcuffs was not properly adjusted such that it

13  was likely "incredibly painful."  (ECF No. 83 at 18.)  The autopsy report reflects this, indicating

14  that Mr. Sanchez had bruises and "band-like" abrasions on both wrists.  (ECF No. 83-3 at 345.)

15  The "abusive application of handcuffs" is unconstitutional.  *Palmer v. Sanderson*, 9 F.3d 1433,

16  1436 (9th Cir. 1993).  Plaintiffs' citation to *Cortesluna v. Leon*, 979 F.3d 645 (9th Cir. 2020),

17  *rev'd on other grounds sub nom. Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021), however, does

18  little, if anything, to support their argument.  The discussion about handcuffing in *Cortesluna*

19  concerned an officer's use of a knee to hold down a subdued subject while handcuffing him.  *Id.*

20  at 655.  The case contained no allegations of tight handcuffing.

21        In this case, it appears that the tight handcuffing was the mistaken product of an

22  unpredictable struggle with Mr. Sanchez.  It is also clear that Deputy Day recognized that the

23  handcuff was too tight.  What is not clear, however, is whether Deputy Day adjusted the handcuff

24  at any point.  The investigator's summary statement says that the deputies "were able to get the

25  handcuffs properly adjusted."  (ECF No. 83-3 at 33.)  Deputy Day's video recorded statement,

26  however, is not so definitive.  In his interview, Deputy Day states an intention to adjust the

27  handcuff, but never actually states that he made such an adjustment.  (*See* Day Video 9:23–40.)

28  Failing to adjust handcuffs with the knowledge that they are too tight is both unreasonable and a

1    clearly recognized violation of the Fourth Amendment.  *Cf. Lalonde v. Cnty. of Riverside*, 204

2    F.3d 947, 952 (9th Cir. 2000) (denying summary judgment where officers refused to loosen

3    handcuffs after plaintiff stated they were too tight); *Palmer*, 9 F.3d at 1436 (same).

4           The Court denies summary judgment as to the claim of excessive force related to the

5    tightness of Mr. Sanchez's handcuffs.

6           **iv.     Use of the defective WRAP restraint**

7                  **a.     There is no evidence that the WRAP restraint constituted a**

8                         **particularly severe use of force.**

9           Plaintiffs make no arguments regarding the severity of the force associated with the use of

10   the WRAP restraint.  A WRAP is a "total body restraint in the style of a cocoon."  *Garcia v. Yuba*

11   *Cnty. Sheriff's Dep't*, 559 F. Supp. 3d 1122, 1125 (E.D. Cal. 2021).  Properly applied, "it forces a

12   person into a 'seated position' with the 'legs straight in front' and hands restrained behind the

13   back."  *Id.* (quoting *Johnson v. Cortes*, No. 09-3946, 2011 WL 445921, at *3 n.1 (N.D. Cal. Feb.

14   4, 2011)).  Though Plaintiffs allege that the device Deputy Defendants used in this case was

15   defective, there is no allegation that those defects caused Mr. Sanchez any injuries or contributed

16   to his inability to breathe.  Nor do they allege that the defects prevented the Deputies from

17   properly restraining Mr. Sanchez in a seated position with his legs out in front of him.  Moreover,

18   the Court cannot determine whether WRAP restraints generally pose any particular dangers or

19   safety risks.  In fact, Mr. Defoe testified at his deposition that the WRAP restraint is a "very

20   effective restraint device in many cases."  (Defoe Dep. 52:5–6.)  Mr. Defoe's objections to the

21   defective WRAP appear to stem mostly from Deputy Defendants' need to modify the restraint

22   device, which prolonged their use of body compressions on Mr. Sanchez.  (*See id.* 52:4–54:14.)

23   Additionally, the Court has not found any case law addressing the severity of WRAP restraints.

24   Because Deputy Defendants applied the WRAP restraint in addition to handcuffs, the Court can,

25   however, conclude that a WRAP constitutes more force than the application of handcuffs.  Even

26   simple handcuffing is not per se reasonable if the surrounding circumstances do not support their

27   use.  *See Meredith v. Erath*, 342 F.3d 1057, 1062–63 (9th Cir. 2003) (recognizing that

28   "handcuffing 'substantially aggravates the intrusiveness' of a detention").

41

1

        **b.**       **Whether it was reasonable to apply the WRAP restraint after Deputy**

2

               **Defendants handcuffed Mr. Sanchez remains a disputed fact.**

3

      Plaintiffs appear to argue that the use of any amount of force associated with the WRAP

4

restraint was excessive because Deputy Defendants had already subdued and handcuffed Mr.

5

Sanchez.  (ECF No. 83 at 19.)  They cite to several cases, but only one – *Blankenhorn v. City of*

6

*Orange* – is on point.  After the officers in *Blankenhorn* tackled the plaintiff, they handcuffed him

7

and placed his wrists and ankles in "hobble restraints."  485 F.3d at 469.  The Court of Appeals

8

held that the use of such restraints might be reasonable in circumstances where officers need to

9

control a suspect who is physically struggling.  *Id.* at 479.  In the plaintiff's case, however, there

10

was a dispute of fact regarding whether officers had provoked the plaintiff's resistance by gang

11

tackling him.  *Id.*  Assuming there was provocation, and the plaintiff offered reasonable

12

resistance, the court held that a jury could find the use of the hobble restraints excessive.  *Id.*

13

      Deputy Defendants do not address the applicability of *Blankenhorn* but argue that using

14

the WRAP restraint was reasonable because Mr. Sanchez "was fully in a position to harm the

15

deputies as evidenced by the undisputed facts that show he tried to get up, grabbed Rohn's

16

weapon, bit a deputy, and continuously tried to kick the deputies trying to detain him.  (ECF No.

17

90 at 5.)  The Court disagrees with this assessment.  At the time Deputy Defendants applied the

18

WRAP, they had successfully handcuffed Mr. Sanchez.  As in *Blankenhorn*, there remain

19

disputed issues of fact regarding whether Deputy Defendants provoked any of Mr. Sanchez's

20

resistance.  In fact, there remains a dispute regarding whether it is appropriate to characterize Mr.

21

Sanchez's actions as resistance.  Given these circumstances, the Court finds that the

22

reasonableness of using the WRAP restraint on Mr. Sanchez remains a disputed material fact.

23

        **c.**       **The existence of disputed facts prevents the Court from ruling on**

24

               **Deputy Defendants' entitlement to qualified immunity.**

25

      *Blankenhorn* also governs the Court's qualified immunity analysis.  As discussed above, a

26

jury could conclude either that Mr. Sanchez's conduct was reasonable resistance to Deputy

27

Defendants' provocation or simply an attempt to breathe.  If that were the case, *Blankenhorn*

28

would have clearly established that the use of additional restraints, beyond handcuffs, on an

1    individual who was not offering active resistance to lawful authority was unreasonable.  Deputy

2    Defendants cite to *Price v. County of San Diego*, 990 F. Supp. 1230 (S.D. Cal. 1998) to assert that

3    such a right is not clearly established.  In *Price*, officers wrestled the decedent to the ground after

4    he started "resisting totally," "going crazy," and reaching for their guns.  *Id.* at 1234–35.  The

5    officers brought the decedent to the ground, where they hogtied him and left him prone on the

6    pavement in hot weather.  *Id.* at 1235.  What distinguishes *Price* from *Blankenhorn* and this case,

7    however, is that the parties in *Price* agreed that the officers used reasonable force up until the

8    point they hogtied the decedent.  *See id.*  Whether that is true in this case remains a disputed

9    factual issue that a jury must address.

10        Therefore, the Court denies summary judgment as to the claim of excessive force related

11   to the use of the WRAP device.

12              **v.       Failure to provide reasonable medical care**

13        When a detainee suffers injuries resulting from an arrest, the Fourth Amendment requires

14   officers to "either promptly summon[] the necessary medical help or [take] the injured detainee to

15   a hospital."  *Tatum*, 441 F.3d at 1099 (quoting *Maddox v. City of Los Angeles*, 792 F.2d 1408,

16   1415 (9th Cir. 1986)).  Officers need not provide "what hindsight reveals to be the most effective

17   medical care for an arrested suspect."  *Id.* at 1098–99.  Plaintiffs argue that Deputy Defendants

18   violated this mandate by driving Mr. Sanchez to the hospital rather than waiting for an

19   ambulance.  (ECF No. 83 at 19–20.)  This was unreasonable, they contend, because Mr. Sanchez

20   had become unresponsive while officers were on top of him and because Deputy Defendants

21   could have summoned an ambulance using a "rapid 'Code' response."  (*Id.*)  The Court disagrees

22   with this assessment.  First, while there may be a dispute regarding whether Mr. Sanchez was

23   unresponsive at some point while Deputy Defendants were on top of him, there is no dispute that

24   he was conscious and screaming while inside the cruiser that drove him to the hospital.  When

25   Deputy Longoria requested an ambulance, he learned that its response time would be delayed.

26   This triggered the decision to drive Mr. Sanchez to the hospital in the cruiser.  As soon as Mr.

27   Sanchez stopped screaming, Deputies Rohn and Babbitt checked on him and then drove "Code 3"

28   for the remaining two minutes to the hospital.  (ECF No. 83-3 at 12, 23.)  "[T]he critical inquiry is

1    not whether the officers did all that they could have done, but whether they did all that the Fourth

2    Amendment requires." *Tatum*, 441 F.3d at 1099.  Under these circumstances, the Court does not

3    find that the method of bringing Mr. Sanchez to the hospital was unreasonable within the

4    meaning of the Fourth Amendment.

5           Even if the method of bringing Mr. Sanchez to the hospital was unreasonable under the

6    circumstances, Deputy Defendants would likely be entitled to qualified immunity.  Plaintiffs cite

7    to no case law finding a Fourth Amendment violation under similar circumstances.  This is

8    unsurprising as "[t]he Ninth Circuit has not precisely defined the contours of what it means to

9    provide 'objectively reasonable post-arrest care.'"  *Henriquez v. City of Bell*, No. CV 14-196-

10   GW(SSx), 2015 WL 13357606, at *6 (C.D. Cal. Apr. 16, 2015).

11          Therefore, the Court grants the motion for summary judgment as it applies to any claim of

12   failing to provide prompt medical care.

13          **vi.**    ***Monell* liability**

14          In *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court

15   held that municipalities and other local government units qualify as "persons," and are therefore

16   subject to lawsuits, under § 1983.  To establish *Monell* liability, a plaintiff must "prove '(1) that

17   [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the

18   municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

19   constitutional right; and, (4) that the policy is the moving force behind the constitutional

20   violation.'"  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v.*

21   *Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432 (9th Cir. 1997)).  Plaintiffs cannot rely merely

22   on a theory of *respondeat superior*.  *Monell*, 436 U.S. at 690.

23          When a government official causes a constitutional violation, a plaintiff can prove the

24   existence of a policy or custom on any of three theories: (1) that the official acted pursuant to

25   expressly adopted official policy; (2) that the official's conduct was a product of the local entity's

26   deficient practices or customs, such as failing to train or supervise; or (3) that the official had

27   "final policy-making authority" or "ratified a subordinate's unconstitutional decision or action

28   and the basis for it."  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (internal

1    quotations omitted).  Plaintiffs alleged all three theories of liability against SCSD and the County

2    in their SAC.  (ECF No. 75 at ¶¶ 43–51.)  In their opposition to the motion for summary

3    judgment, however, they advance an argument of entity liability based solely on a theory of

4    ratification.  (ECF No. 83 at 24–25.)  Because Plaintiffs' opposition addresses only the

5    ratification theory, Defendants contend that Plaintiffs have conceded any argument based on an

6    express policy or failure to train or supervise.  (ECF No. 90 at 9.)  This is not quite correct.  While

7    a failure to respond to a motion for summary judgment may permit a court to consider the facts at

8    issue undisputed, it does not amount to "a complete abandonment of [the party's] opposition to

9    summary judgment."  *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013).  The Court

10   will, therefore, address all three theories of liability.

11            **a.      Ratification**

12            To prove *Monell* liability under a ratification theory, a plaintiff must show that "a

13   policymaker approve[d] a subordinate's decision *and the basis for it*."  *Gillette v. Delmore*, 979

14   F.2d 1342, 1348 (9th Cir. 1992) (emphasis in original).  "A mere failure to overrule a

15   subordinate's actions, without more, is insufficient to support a § 1983 claim."  *Lytle v. Carl*, 382

16   F.3d 978, 987 (9th Cir. 2004).  Additionally, ratification requires "something more than the

17   failure to reprimand."  *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1190 (D. Haw. 2003).  Still, "[a]

18   single decision by a municipal policymaker 'may be sufficient to trigger Section 1983 liability

19   under *Monell*, even though the decision is not intended to govern future situations,' but the

20   plaintiff must show that the triggering decision was the product of a 'conscious, affirmative

21   choice' to ratify the conduct in question."  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1055

22   (9th Cir. 2009) (quoting *Gillette*, 979 F.2d at 1347).  "Ordinarily, ratification is a question for the

23   jury."  *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999).

24            Plaintiffs concede that any failure on behalf of the County or SCSD to discipline Deputy

25   Defendants is not, standing alone, sufficient to establish liability under *Monell*.  (ECF No. 83 at

26   24.)  Rather, they allege that liability arises from the failure of the County and SCSD to

27   investigate Deputy Defendants' conduct.  (*Id.*)  Defendants argue that the undisputed evidence

28   demonstrates that an investigation did occur and that it resulted in the exoneration of Deputy

1    Defendants.  (ECF No. 80-1 at 24–25; ECF No. 90 at 10.)  The sole citation they provide to

2    support this assertion is to Deputy Rohn's deposition, which contains the following exchange:

3              Q. And when you say it was being investigated, was it investigated
               by the internal affairs department within the sheriff's department?
4
               A. Yes.
5
               Q. . . . So were you being interviewed as part of that IA investigation?
6
               A. Yes.
7
               Q. Did you ever get any indication as to what the results of the
8              investigation was?

9              A. I have been cleared.

10             Q. Do you know if anybody else was cleared?

11             A. The incident indicates we were all cleared.

12

13   (Rohn Depo. 15:9–21.)  It appears that the interview at issue in this exchange is the same one that

14   Plaintiffs attached as their Exhibit 4.  (*See* ECF No. 83-3 at 27–28.)  Plaintiffs provided copies of

15   similar recorded interviews with Deputies Babbitt, Day, and Camara.  (*See id.* at 14–15, 37–38,

16   43–44.)  They also provided the investigating officer's summary statements.  Plaintiffs cite to this

17   evidence repeatedly in their Statement of Facts.  (*See* ECF No. 83-2.)  Based on this, it is difficult

18   for the Court to accept Plaintiffs' assertion that "no discovery responsive to Plaintiffs' requests

19   for internal affairs/citizen complaint investigation documents was produced."  (ECF No. 83 at

20   24.)  Plaintiffs further fail to specify what other evidence they believe Defendants have withheld.

21   Nor is there any indication Plaintiffs have sought to depose anyone from the SCSD internal

22   affairs department who would have been familiar with the investigation or the citizen complaint

23   process.  If Plaintiffs believed there was specific information that was unavailable to them at the

24   time they filed their opposition, they should have declared as such in an affidavit or declaration,

25   pursuant to Federal Rule of Civil Procedure 56(d).  *See Summers v. Leis*, 368 F.3d 881, 887 (6th

26   Cir. 2004) (holding that "bare allegations or vague assertions of the need for discovery are not

27   enough" to oppose summary judgment); *Simmons Oil Corp. v. Tesoro Petro. Corp.*, 86 F.3d

28   1138, 1144 (Fed. Cir. 1996) (same).

                                                    46

1       Plaintiffs argue that Defendants' failure to respond to the citizen complaint they submitted

2   on December 4, 2018 is post-event evidence demonstrating a policy of failing to investigate

3   incidents of alleged excessive force.  Post-event evidence is not only admissible, but also "highly

4   probative" when considering the "existence of a municipal defendant's policy or custom."  *Henry*

5   *v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997).  For instance, in *Henry v. County of Shasta*,

6   officers stopped the plaintiff for a minor traffic violation and arrested him after he refused to sign

7   a ticket.  132 F.3d at 514.  A nurse at the station ordered him to strip naked and placed him in a

8   padded cell before officers "paraded [him] through the jail, naked, to the booking cage in full

9   view of male and female deputies and inmates."  *Id.* at 516.  In opposition to a motion for

10  summary judgment on his *Monell* claims, the plaintiff provided affidavits from two other

11  individuals who underwent nearly identical experiences at the Shasta County Jail several months

12  after the plaintiff's incident.  *Id.* at 518–19.  The Ninth Circuit held that these declarations were

13  sufficient to defeat summary judgment on the *Monell* claims.  *Id.* at 520.

14      The situation here is quite different.  Plaintiffs filed their citizen complaint on December

15  4, 2018, over four months after filing the initial complaint in this matter.  (*See* ECF No. 83-3 at

16  371.)  The individual who filed the complaint was Plaintiffs' counsel in this matter.  (*See id.*)

17  After Plaintiffs did not receive a response, they sent a follow-up letter.  (*See id.* at 408–09.)  In

18  response, they received a terse email from Defendants' counsel accusing them of unethical

19  communication with a represented party and improper attempts at discovery during ongoing

20  litigation.  (*Id.* at 411.)  Unlike in *Henry*, Plaintiffs have not proffered independent evidence of a

21  failure to investigate other instances of alleged misconduct.  While Defendants' response perhaps

22  indicates intransigence, it is not evidence of a failure to investigate.  In fact, as discussed above, it

23  is undisputed that an internal investigation did occur after Mr. Sanchez's death.  The Court cannot

24  base a *Monell* claim on conduct that boils down to a discovery dispute between the parties.

25      Unlike other cases that have found ratification based on inadequate investigations,

26  Plaintiffs have not offered any evidence beyond the mere absence of disciplinary action and the

27  lack of response to Plaintiffs' citizen complaint.  *Cf., e.g.*, *Fuller v. City of Oakland*, 47 F.3d

28  1522, 1535 (9th Cir. 1995) (finding evidence of ratification where case file revealed "glaring

1    deficiencies" including "delays in investigation, a failure to meet with or credit the testimony of

2    witnesses supporting [the plaintiff], an attempt to close the investigation without even speaking

3    with [the accused party] and a one-sided resolution of disputes of fact"); *Perkins v. City of*

4    *Modesto*, No. 1:19-cv-00126-NONE-EPG, 2022 WL 297101, at *17–*18 (E.D. Cal. Feb. 1,

5    2022) (finding dispute of material fact regarding ratification when plaintiff presented evidence

6    that the investigating police department destroyed the suspect officer's department-issued cell

7    phone).  The Court, therefore, finds that Plaintiffs have not carried their burden of demonstrating

8    *Monell* liability on a ratification theory.

9                          **b.        Formal policy**

10       Defendants claim that their use of force policy is facially constitutional.  (ECF No. 80-1 at

11   23–24.)  Plaintiffs do not challenge this assertion.  The Court agrees that none of the policies the

12   parties have submitted contain formal and express language that would support a *Monell* claim.

13                      **c.        Failure to train or supervise**

14       A failure to train or supervise can amount to deliberate indifference of a constitutional

15   right if the government disregarded known or obvious consequences of such a failure.  *See*

16   *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Board of Comm'rs of Bryan Cnty v. Brown*,

17   520 U.S. 397, 410 (1997)).  It is "ordinarily necessary" to demonstrate a pattern of constitutional

18   violations to make out a failure to train or supervise claim.  *Id.* at 62.  Such proof shows that

19   policymakers were on notice regarding the constitutional deficiencies of a training or supervision

20   program and chose to perpetuate it.  *Id.*  There are cases, however, where "the need for more or

21   different training [or supervision] is so obvious, and the inadequacy so likely to result in the

22   violation of constitutional rights, that the policymakers . . . can reasonably be said to have been

23   deliberately indifferent to the need."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Such

24   single-incident cases are rare, and they occur only when the consequences of failing to train or

25   supervise are "patently obvious."  *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir.

26   2016) (quoting *Connick*, 563 U.S. at 63).

27       Defendants argue that summary judgment is proper because Plaintiffs have failed to

28   demonstrate that SCSD's training program is inadequate.  (ECF No. 80-1 at 25.)  They further

1    contend that, because SCSD policy permits officers to use only reasonable force, "it is doubtful a

2    different training regimen would have led to a different result." (*Id.*)  Defendants misunderstand

3    their burden, which is to demonstrate "an absence of evidence to support the nonmoving party's

4    case." *Soremekun*, 509 F.3d at 984.  Nowhere in their declarations or depositions do Deputy

5    Defendants discuss any training they received regarding excessive force.  Only Deputy Rohn

6    testifies to any familiarity with SCSD's use of force policy.  (Rohn Decl. at ¶ 23.)  The use of

7    force policy itself contains no directives regarding training apart from a single sentence stating,

8    "Deputies will receive periodic training on this policy and demonstrate their knowledge and

9    understanding." (ECF No. 80-4 at 135.)  How frequent the training is, what it entails, whether the

10   County and SCSD update it in response to new and changing law – all of these questions are left

11   to the Court's imagination.

12        The lack of evidence of any excessive force training is particularly disturbing in light of

13   the opinions Plaintiffs' police practices expert, Scott Defoe, rendered in his report.  He identifies

14   failures in appreciating and responding appropriately to indicators that Mr. Sanchez was suffering

15   a mental health crisis.  (ECF No. 83-3 at 157–58.)  For example, no deputy sought assistance

16   from a behavioral health response team or employed de-escalation tactics in an effort to calm the

17   situation before it erupted into a physical struggle.  (*Id.* at 160–64.)  Mr. Defoe also articulates

18   alternatives to using a defective WRAP restraint – handcuffing, RIPP Restraint Hobbles, and, if

19   necessary, a functioning WRAP device.  (*Id.* at 164.)  The deputies' use of a defective WRAP, he

20   posits, kept Mr. Sanchez in a dangerous physical position for a longer period of time while the

21   deputies figured out how to improvise with a WRAP model few, if any, of them had used.  (*Id.* at

22   165.)  Properly trained officers would have known to use tactics that did not pose such a high risk

23   of asphyxia.  (*Id.*)  Finally, Mr. Defoe asserts that SCSD has failed to train its deputies in subject

24   areas such as "Proper Response and Interaction with the Mentally Ill, Working as a Team, Verbal

25   Strategies, Active Listening Skills, Crisis Intervention Training, Defusing and De-Escalation

26   Techniques, and Positional/Restraint Asphyxia." (*Id.* at 177.)  In coming to his conclusions, Mr.

27   Defoe relied on California's Peace Officer Standards and Training, which apply to all state police

28   officers, as well as experience from his twenty-eight-year career in law enforcement.

49

1    Plaintiffs have also alleged a history of excessive force verdicts, judgments, and

2    complaints against the County.  (*See* ECF No. 75 at ¶ 46.)  Defendants argue that those incidents

3    are irrelevant because they involved different factual scenarios and different deputies.  (ECF No.

4    80-1 at 24.)  The existence of these cases, however, would have illuminated a need for excessive

5    force training beyond whatever deputies receive at the academy.  Defendants, however, have not

6    demonstrated that Deputy Defendants received any use of force training, much less training

7    responsive to prior claims of excessive force.  Such a deficiency would be inadequate, and the

8    Court must, therefore, deny summary judgment on Plaintiffs' *Monell* claims.

9    **B.     Claims 2 and 3: Right to Familial Association under the First and Fourteenth**

10   **Amendments**

11   "[P]arents have a Fourteenth Amendment liberty interest in the companionship and

12   society of their children."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  The Ninth

13   Circuit has recognized a similar right under the First Amendment.  *Lee v. Cnty. of Los Angeles*,

14   250 F.3d 668, 685–86 (9th Cir. 2001).  Courts assess both types of familial association claims

15   using the same substantive legal standards.  *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 973 (E.D.

16   Cal. 2017).[12]

17   Officers violate a family member's right to familial association when their conduct

18   "shocks the conscience."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  When officers

19   have an opportunity to deliberate, their conduct shocks the conscience when they act with

20   deliberate indifference.  *Wilkinson*, 610 F.3d at 554.  Proof of deliberate indifference requires a

21   "showing that the officer 'disregarded a known or obvious consequence of his action.'"

22   *Nicholson v. City of Los Angeles*, 935 F.3d 685, 693 (9th Cir. 2019) (quoting *Patel v. Kent Sch.*

23   *Dist.* 648 F.3d 965, 974 (9th Cir. 2011)).  When an officer, however, must make "a snap

24

---

25   [12] Plaintiff argues that this is not necessarily the case, citing to *Mann v. City of Sacramento*, 521 F. Supp. 3d 917, 922
     (E.D. Cal. 2021).  (ECF No. 83 at 26.)  In *Mann*, however, the dispute concerned whether "adult, non-cohabitating

26   siblings" could bring a familial association claim under the First Amendment, something the Ninth Circuit has
     prohibited in the Fourteenth Amendment context.  *Mann*, 521 F. Supp. 3d at 922.  *Mann* does not address whether the

27   substantive standards of a familial association claim differ under the First and Fourteenth Amendments.  In this case,
     there is no dispute that Ms. Sanchez, Mr. Sanchez's mother, can state a familial association claim under both the First
     and Fourteenth Amendments.  Because the dispute concerns the substantive standards of the claim, *Mann* is of no use

28   to the Court's analysis.

50

1    judgment because of an escalating situation, his conduct may only be found to shock the

2    conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."

3    *Wilkinson*, 610 F.3d at 554.  Typically, "meritorious purpose to harm claims will involve

4    evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use

5    of force." *Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019).  Nevertheless, "a use of force

6    might be so grossly and unreasonably excessive that it alone could evidence a subjective purpose

7    to harm." *Id.*

8           The parties dispute whether the "deliberate indifference" or "purpose to harm" standard

9    applies in this case.  (*See, e.g.*, ECF No. 83 at 25 (arguing summary judgment fails under either

10   standard)).  Deputy Defendants argue that the "purpose to harm" standard is proper because Mr.

11   Sanchez's conduct caused the incident to escalate rapidly.  (ECF No. 90 at 10.)  Under the

12   "purpose to harm" standard, they argue, there is no evidence that Deputy Defendants acted with

13   an intent to harm divorced from legitimate law enforcement purposes.  (ECF No. 80-1 at 27.)

14   Plaintiffs claim that the "deliberate indifference" standard should apply because Deputy

15   Defendants were "on top of Mr. Sanchez for up to 10 minutes," permitting them an opportunity to

16   deliberate about their actions.  (ECF No. 83 at 25.)  In the alternative, Plaintiffs argue that Deputy

17   Defendants acted with a "purpose to harm" because they unnecessarily restrained Mr. Sanchez

18   with unreasonable force while he gasped for air under their weight.  (*Id.*)

19          Based on the evidence before it, the Court finds that a material dispute of fact remains

20   regarding the proper standard to apply.  Whether Deputy Defendants intentionally took Mr.

21   Sanchez to the ground – and whether any take-down was "controlled" – remains in dispute.

22   There is also a dispute regarding whether Mr. Sanchez's movements while on the ground

23   constituted active resistance or merely an attempt to breathe.  A jury could find that when Mr.

24   Sanchez – who had demonstrated signs of mental illness and had made no threatening gestures or

25   statements – stood up, Deputy Defendants tackled him to the ground and held him down for up to

26   ten minutes as he gasped for air and cried for help.  This is conduct that would be "so grossly and

27   unreasonably excessive" as to demonstrate an intent to harm.[13]  *See Nehad*, 929 F.3d at 1140.

28   _____
     [13] Plaintiffs also argue that the use of a makeshift WRAP restraint supports an inference of a "purpose to harm."

1   Even so, a question of fact remains regarding whether Plaintiffs even need to demonstrate

2   a "purpose to harm." Deputy Defendants claim their conduct was a response to a rapidly

3   evolving situation, but that is not necessarily the case. Again, viewing the facts in the light most

4   favorable to Plaintiffs, a jury could find that Mr. Sanchez began having a mental health episode

5   after interacting with Deputy Defendants for several minutes. He then stood up and Deputy

6   Defendants jumped on him and pinned him to the ground. Just because Deputy Defendants did

7   not take the time to deliberate before acting does not mean they did not have the opportunity to do

8   so. The question is whether deliberation was "practical." *Tan Lam v. City of Los Banos*, 976

9   F.3d 986, 1003 (9th Cir. 2020). The Court cannot answer that question without input from a jury.

10   Deputy Defendants claim that, even if they violated Plaintiffs' Fourteenth Amendment

11   rights, they are nevertheless entitled to qualified immunity. (ECF No. 80-1 at 27–28.) Just as

12   courts analyze First and Fourteenth Amendment familial association claims under the same

13   substantive legal standards, they also measure the availability of qualified immunity under both

14   claims using the same standard. *See Kaur*, 263 F. Supp. 3d at 974.

15   "[I]t has been clearly established since 1998 'that a police officer violates the Fourteenth

16   Amendment due process clause if he kills a suspect when acting with the purpose to harm,

17   unrelated to a legitimate law enforcement objective.'" *Foster v. City of Indio*, 908 F.3d 1204,

18   1211 (9th Cir. 2018). It is undisputed that Mr. Sanchez died following his interaction with

19   Deputy Defendants. Deputy Defendants argue that they are nevertheless entitled to qualified

20   immunity because they did not act "to cause harm or kill" Mr. Sanchez but rather used force "for

21   a legitimate law enforcement objective to control the tense and escalating situation for Sanchez's

22   safety, and their own." (ECF No. 80-1 at 27.) As the Court has repeatedly stated, this is not an

23   undisputed version of the facts. A jury must decide if Deputy Defendants evinced any intent to

24   harm based on the egregiousness of their conduct. It also remains a question for the jury whether

25   controlling Mr. Sanchez's movements was necessary to preserve his safety and the safety of the

26   _____

(ECF No. 83 at 25.) As discussed already in this order, Plaintiffs have provided no evidence that the "defective"

27   WRAP contributed to Mr. Sanchez's death or even caused him pain. While the use of the WRAP may have been unreasonable under the circumstances, the Court cannot find that its use amounted to deliberate indifference. *See*

28   *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1003 (9th Cir. 2020) (recognizing that claims for excessive force under the Fourth Amendment are not congruent with due process claims under the Fourteenth Amendment).

1   officers.  Resolving those factual disputes will shed more light on whether Deputy Defendants

2   can claim entitlement to qualified immunity.

3   **C.      Claims 4, 6, and 7: Procedural due process under the Fourteenth Amendment of the**

4   **Federal Constitution and Article I, section 7(a) of the California Constitution;**

5   **Failure to discharge a mandatory duty pursuant to California Government Code**

6   **section 815.6**

7        In the SAC's fourth and sixth claims, the Estate alleges that Defendants violated the

8   procedural due process clauses of the Federal and California Constitutions by failing to

9   investigate a citizen complaint that the Estate submitted to SCSD on December 4, 2018.  (*See*

10  ECF No. 75 at ¶¶ 68–72, 80–84.)  Similarly, the Estate alleges that Defendants failed to discharge

11  a mandatory duty under California law, pursuant to California Government Code section 815.6.

12  (*Id.* at ¶¶ 85–88.)  The citizen complaint that the Estate's attorney filed lists both the Estate and

13  Bertha Sanchez as complainants.  (ECF No. 83-3 at 372.)  Nevertheless, the SAC does not list

14  Bertha Sanchez as a party to the fourth, sixth, or seventh claims.

15       Defendants argue that Plaintiff Estate of Sanchez does not have standing to assert the

16  procedural due process claims because it "was not an entity prior to Alejandro Sanchez's death,

17  and this claim is premised on a failure to investigate a citizen complaint following Alejandro

18  Sanchez's death."  (ECF No. 80-1 at 29.)  Plaintiffs counter that the Estate merely represents the

19  interests of Mr. Sanchez's successors in interest, who themselves have standing to sue.  (ECF No.

20  83 at 27.)  Plaintiffs' citations, however, do not address Defendants' argument.  In *Estate of*

21  *Duran v. Chavez*, No. 2:14-cv-02048-TLN-CKD, 2015 WL 8011685, at *8 (E.D. Cal. Dec. 7,

22  2015), the parties disputed whether the decedent's estate was a legal entity with the capacity to

23  sue.  The court held that the estate was a proper party to the suit because it stood in as a

24  representative for the decedent's successors in interest.  *Id.*  Similarly, in *Estate of Elkins v.*

25  *Pelayo*, No. 1:13-CV-1483 AWI SAB, 2020 WL 2571387, at *2 (E.D. Cal. May 21, 2020), the

26  defendants argued that, because California law designated three of decedent's family member as

27  successors in interest, it was "improper for less than all three of [those family members] to pursue

28  the survival claims [in the complaint]."  The court disagreed, holding that California's "survival

1  statutes do not require all heirs/beneficiaries to jointly pursue a decedent's cause of action as 'co-
2  successors in interest.'"  *Id.* at *7.  Defendants do not challenge, as in *Estate of Duran*, the
3  Estate's capacity to sue as an entity.  Nor do they allege, as in *Estate of Elkins*, that the
4  composition of the Estate is somehow deficient.  Rather, the Court understands their argument to
5  be that the Estate does not have standing to pursue causes of action arising after Mr. Sanchez's
6  death where Mr. Sanchez himself never suffered an actual injury.

7       California's survival statute provides that "a cause of action for or against a person is not
8  lost by reason of the person's death, but survives subject to the applicable limitations period."
9  Cal. Code Civ. P. § 377.20.  The decedent's successor in interest has standing to bring any causes
10 of action that the decedent himself could have asserted.  *Id.* § 377.30.  The survivor statutes do
11 not create "a new cause of action that vests" in the decedent's successors in interest.  *Quiroz v.*
12 *Seventh Ave. Ctr.*, 45 Cal. Rptr. 3d 222, 227 (Cal. Ct. App. 2006).  Rather, it "merely prevent[s]
13 the abatement of the cause of action of the injured person, and provide[s] for its enforcement by
14 or against the personal representative of the deceased."  *Id.* (quoting *Grant v. McAuliffe*, 264 P.2d
15 944, 948 (Cal. 1953)).  "[A] complete cause of action need not exist at the time of the injured
16 party's death in order for rights to survive which later may mature in an actionable claim."  *Carr*
17 *v. Progressive Casualty Ins. Co.*, 199 Cal. Rptr. 835, 841 (Cal. Ct. App. 1984).  Nevertheless,
18 "the damages recoverable are limited to the loss or damage that *the decedent* sustained or incurred
19 before death, including any penalties or punitive or exemplary damages that the decedent would
20 have been entitled to recover had the decedent lived . . . ."  Cal. Code Civ. P. § 377.34 (emphasis
21 added).  The question, then, is whether Mr. Sanchez himself could have asserted the procedural
22 due process claims at issue, but for his death.

23      The answer is no.  The mandatory duty to investigate a citizen complaint pursuant to
24 California Penal Code section 832.5 is triggered by the filing of the complaint, not by the alleged
25 misconduct.  *See Galzinski v. Somers*, 207 Cal. Rptr. 3d 191, 199 (Cal. Ct. App. 2016) (holding
26 that law enforcement departments have a ministerial duty to comply with the terms of their own
27 published procedures for handling citizen complaints).  At the time of his interaction with Deputy
28 Defendants, Mr. Sanchez had not submitted a citizen complaint to SCSD.  He, therefore, suffered

1    no injury linked to Defendants' alleged failure to process the citizen complaint or investigate its

2    allegations.  Nor is this an instance where the cause of action simply failed to accrue before Mr.

3    Sanchez's death.  An example of such a case would be if Mr. Sanchez had filed a citizen

4    complaint while he was alive, but evidence of a failure to investigate arose following his death.

5    The Estate of Sanchez may have had standing to pursue such a claim, but that is not the case here.

6    While Defendants do not assert standing as a reason to dismiss the Estate's seventh claim for

7    failure to discharge a mandatory duty, the same logic applies.  Because standing is a jurisdictional

8    requirement, courts must address it even if the parties do not raise it as an issue.  *Casey v. Lewis*,

9    4 F.2d 1516, 1524 (9th Cir. 1993).

10        Plaintiffs argue that failing to accord the Estate standing would cause a decedent's heirs

11   and successors "to lose the ability to complain and to request an investigation upon the death of

12   their decedent."  (ECF No. 83 at 27.)  This, they claim, "would have 'the perverse effect of

13   making it more [] advantageous for a defendant to kill rather than injure his victim.'"  (*Id.* (citing

14   *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1104 (9th Cir. 2014).)  This is not true.  Neither

15   California Penal Code section 832.5(a), nor the SCSD personnel complaints policy restrict the

16   availability of citizen complaints to those who themselves have suffered abuses at the hands of

17   law enforcement.  (*See* ECF No. 83-3 at 350 ("Sources of Complaints").)  Plaintiffs' attorney

18   appears to recognize this, as he filed the citizen complain in question and included the names of

19   four individuals as complainants along with the Estate of Sanchez.  (*Id.* at 372.)  The issue is that

20   none of those individuals have brought a procedural due process or a failure to discharge a

21   mandatory duty claim against Defendants.  For example, Bertha Sanchez is a named plaintiff in

22   this case and a complainant listed on the citizen complaint.  She has a personal interest in the

23   status of the citizen complaint and could likely allege an injury based on a failure to investigate,

24   yet she inexplicably does not join Plaintiff Estate of Sanchez in the SAC's fourth, sixth, or

25   seventh claims.

26        Accordingly, the Court grants summary judgment on Plaintiff's fourth, sixth, and seventh

27   claims on standing grounds.

28   ///

1    **D.     Claim 5: Excessive force under Article I, section 13 of the California Constitution**

2         Defendants failed, in their opening brief, to move for summary judgment on Plaintiffs'

3    fifth claim under the California Constitution.  (ECF No. 83 at 28.)  In a footnote of their reply,

4    Defendants posit that their arguments for summary judgment under the Federal Constitution

5    apply with equal force to Plaintiffs' excessive force claim under the California Constitution.

6    (ECF No. 90 at 6 n.2.)  They also contend that the California Constitution "does not itself provide

7    a private cause of action for civil litigants such as Plaintiffs."  (*Id.*)

8         "It is inappropriate to consider arguments raised for the first time in a reply brief."  *Ass'n*

9    *of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006);

10   *see also United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006).  Such a rule is particularly apt

11   where the party's argument appears solely in a footnote.  *See Schmalz v. Sovereign Bancorp, Inc.*,

12   868 F. Supp. 2d 438, 457 n.14 (E.D. Pa. 2012) ("An argument made only in a footnote is not

13   worthy of credence (other than to be rejected by footnote).").  The Court, therefore, denies any

14   motion for summary judgment Defendants have made on Plaintiffs' fifth claim.

15   **E.     Claim 8: Bane Act**

16        California Civil Code section 52.1, known as the Bane Act, provides a cause of action

17   against anyone who "interferes, or tries to do so, by threats, intimidation, or coercion, with an

18   individual's exercise or enjoyment of rights secured by federal or state law."  *Jones v. Kmart*

19   *Corp.*, 949 P.2d 941, 942 (Cal. 1998); *see also* Cal. Civ. Code § 52.1(b).  "The essence of a Bane

20   Act claim is that the defendant, by the specified improper means . . . tried to or did prevent the

21   plaintiff from doing something he or she had the right to do under the law or to force the plaintiff

22   to do something that he or she was not required to do under the law."  *Austin B. Escondido Union*

23   *Sch. Dist.*, 57 Cal. Rptr. 3d 454, 472 (Cal. Ct. App. 2007).  Section 52.1 does not require that "the

24   offending 'threat, intimidation or coercion' be 'independent' from the constitutional violation

25   alleged."  *Cornell v. City and Cnty. of San Francisco*, 225 Cal. Rptr. 3d 356, 383 (Cal. Ct. App.

26   2017); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).  Rather, "the

27   egregiousness required by Section 52.1 is tested by whether the circumstances indicate the

28   arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable

1    seizure." *Cornell*, 225 Cal. Rptr. at 384.  Officers need not understand they were acting

2    unlawfully.  *Id.* at 386.  "Reckless disregard of the 'right at issue' is all that [is] necessary."  *Id.*

3           Defendants first argue that the court must grant summary judgment on Plaintiffs' Bane

4    Act claims based on excessive force because (1) the force they used was reasonable under the

5    circumstances; (2) Deputy Defendants did not act with the specific intent to violate Mr. Sanchez's

6    rights; and (3) Deputy Defendants' conduct did not constitute "threats, intimidation, or coercion."

7    (ECF No. 80-1 at 31–32.)  These arguments fail because they depend on resolving disputes of

8    material fact in favor of Defendants, rely on outdated case law, and misread recent cases

9    interpreting section 52.1.

10          First, as the Court has already discussed thoroughly, there remain material disputes of fact

11   regarding whether Deputy Defendants used unreasonable force in their interaction with Mr.

12   Sanchez.  Second, Defendants misread *Reese v. County of Sacramento* and *Cornell v. City and*

13   *County of San Francisco* as requiring a heightened standard of intent.  (*See* ECF No. 80-1 at 31–

14   32.)  *Cornell* makes clear, however, that, while negligence is not sufficient to support a Bane Act

15   claim, recklessness is.  *Cornell*, 225 Cal. Rptr. 3d at 384.  As discussed above, it remains disputed

16   whether Deputy Defendants acted in reckless disregard of Mr. Sanchez's constitutional rights.

17   Finally, Defendants rely on *Lanier v. City of Fresno*, No. CV F 10-1120 LJO SKO, 2011 WL

18   149802, at *4 (E.D. Cal. Jan. 18, 2011) and *Bender v. County of Los Angeles*, 159 Cal. Rptr. 3d

19   204, 215 (Cal. Ct. App. 2013) for the proposition that Plaintiffs must demonstrate a "threat,

20   intimidation, or coercion" beyond the act of unreasonable force itself.  (ECF No. 80-1 at 32.)

21   Both *Lanier* and *Bender* predate *Cornell*, which clarified California state law regarding whether

22   the Bane Act requires "a separate showing of coercion beyond that inherent in the use of force."

23   *See Reese*, 888 F.3d at 1043.  *Cornell* made clear that the Bane Act requires only one element

24   beyond the existence of an underlying constitutional violation – specific intent.  *See id.*

25          Defendants also argue that Ms. Sanchez's Bane Act claim based on her right to familial

26   association must fail because she was not present at the time of the incident.  (ECF No. 80-1 at

27   32.)  The Court cannot discern why this would be the case, and Defendants supply no authority to

28   support their position.  Defendants' attempts to distinguish *L.F. v. City of Stockton*, No. 2:17-cv-

1    01648-KJM-DB, 2020 WL 4043017, at *23 (E.D. Cal. Jul. 17, 2020) are to no avail.  (*See* ECF

2    No. 90 at 13.)  They argue that *L.F.* is distinguishable because it involves "conscious shocking"

3    conduct sufficient to satisfy the Bane Act's specific intent requirement.  As this Court has

4    discussed, however, whether the conduct of Deputy Defendants was "conscious shocking"

5    remains a disputed fact in this case.  Therefore, whether Deputy Defendants had the specific

6    intent to violate Plaintiff Bertha Sanchez's right to familial association also remains disputed.

7         Defendants County and SCSD also assert that they are entitled to immunity for claims

8    under the Bane Act pursuant to California Government Code section 815(a).  (ECF No. 80-1 at

9    32–33).  That section states, "Except as otherwise provided by statute: [a] public entity is not

10   liable for an injury, whether such injury arises out of an act or omission of the public entity or a

11   public employee or any other person."  Cal. Gov't Code § 815(a).  Plaintiffs claim that the Bane

12   Act itself is a statute providing for liability that falls within the exception to section 815(a).  (ECF

13   No. 83 at 31.)  Therefore, they claim, the County and SCSD are directly liable under the Bane

14   Act.  (*Id.*)  Defendants counter that Plaintiffs did not plead direct liability in the SAC, but rather

15   asserted liability based only on a *respondeat superior* theory.  (ECF No. 90 at 15.)  Plaintiffs also

16   advance an argument based on vicarious liability in their opposition.  (ECF No. 83 at 31.)

17        It is, at most, unclear whether the Bane Act creates a statutory exception abrogating public

18   entity immunity under section 815(a) that would permit direct public entity liability.  *See Towery*

19   *v. State of California*, 221 Cal. Rptr. 3d 692, 697–98 (Cal. Ct. App. 2017) (holding that the Bane

20   Act does not abrogate public entity immunity for injuries to prisoners under Cal. Gov't Code §

21   844.6 and stating in dicta that "the plain language of section[] 815" does not permit public entity

22   liability under the Bane Act); *Barber v. Cnty. of Orange*, No. SACV 21-00031-CJC (JDEx), 2021

23   WL 2981015, at *3 (C.D. Cal. Apr. 29, 2021) (citing *Towery* for the proposition that the Bane Act

24   does itself provide a claim against public entities); *Hin v. U.S. Dep't of Just. U.S. Marshals Serv.*,

25   2:21-cv-00393-TLN-JDP, 2022 WL 705617, at *5 (E.D. Cal. Mar. 9, 2022) (Section 52.1 does

26   not provide a statutory exception to the State's immunity.").

27        Nevertheless, as Plaintiffs assert, public entities can be liable "for injury proximately

28   caused by an act or omission of an employee . . . if the act or omission would . . . have given rise

1    to a cause of action against that employee or his personal representative." Cal. Gov't Code §

2    815.2(a).  The Bane Act provides a basis for such liability. *Barber*, 2021 WL 2981015, at *3;

3    *Henneberry v. City of Newark*, No. 13-cv-05238-MEJ, 2014 WL 4978576, at *7 (N.D. Cal. Oct.

4    6, 2014).  Defendants posit that the Court must disregard Plaintiffs' assertion of vicarious liability

5    because such liability "does not support an independent claim for relief against the County."

6    (ECF No. 90 at 15.)  Plaintiffs' SAC, however, contains no independent claim for relief under

7    section 815.2.  Rather, it states a claim under the Bane Act on a vicarious liability theory pursuant

8    to section 815.2.

9         Finally, Plaintiff Estate of Sanchez asserts a procedural due process claim against the

10    County and SCSD for their alleged failure to investigate the citizen complaint pursuant to

11    California Penal Code 832.5.  (ECF No. 75 at ¶¶ 102–106.)  As the Court has already discussed,

12    the Estate lacks standing to pursue such a claim.

13        Therefore, Defendants' motion for summary judgment is granted as to Plaintiff Estate of

14    Sanchez's procedural due process claim.  The motion is denied as to the remaining claims under

15    the Bane Act.

16    **F.     Claims 9, 10, and 11: Assault/Battery, Negligence, and Wrongful Death**

17        Defendants argue that Plaintiffs' state law assault/battery, negligence, and wrongful death

18    claims succeed or fail based on the Court's determination of whether Deputy Defendants used

19    reasonable force in their interaction with Mr. Sanchez.  (ECF No. 80-1 at 33–35.)  Plaintiffs

20    disagree only to the extent that California state negligence law encompasses a broader set of

21    conduct than excessive force under federal law and that California state wrongful death law

22    permits recovery based on negligence.  (ECF No. 83 at 32–33.)  The Court need not address this

23    dispute because both parties agree that the motion for summary judgment on these claims cannot

24    succeed if a material dispute of fact remains regarding whether Deputy Defendants used

25    excessive force.

26        Defendants County and SCSD also assert immunity under California Government Code

27    section 815(a).  (ECF No. 80-1 at 34–35.)  As discussed above, Plaintiffs assert vicarious liability

28    under these causes of action pursuant to California Government Code section 815.2(a).  Because

59

Deputy Defendants have not demonstrated that they are immune from suit under California

Government Code section 815.2(b), neither the County nor SCSD can claim immunity.[14]

Finally, Defendants County and SCSD claim immunity for Plaintiff Bertha Sanchez's wrongful death claim pursuant to California Government Code section 820.2.  (ECF No. 80-1 at 34.)  They acknowledge, however, that the availability of such an immunity depends on a finding that Deputy Defendants' use of force was reasonable.  (*Id.*)

Because material facts remain in dispute, the Court denies Defendants' motion for summary judgment on Plaintiffs' state law tort claims.

**VII.**

**Conclusion**

1.     Defendants' motion is granted on Claim 1 as it relates to the involvement of Deputies Camara, Knittel, Poust, and Longoria in the take-down of Mr. Sanchez because there is no evidence that any of those deputies participated in the alleged conduct;

2.     Defendants' motion is granted on Claim 1 as it relates to Deputy Defendants' failure to provide reasonable medical care because Plaintiffs have failed to present a dispute of material fact regarding the reasonableness of Deputy Defendants' conduct in transporting Mr. Sanchez to the hospital;

3.     Defendants' motion is granted as to Claims 4, 6, and 7 because the Estate lacks standing to pursue them;

4.     Defendants' motion is granted as to the Estate's procedural due process claim under Claim 8 because the Estate lacks standing to pursue it; and

///

///

///

---

[14] Plaintiffs also claim that Defendants County and SCSD can be held directly liable under California Code of Civil Procedure section 377.60 for Plaintiff Bertha Sanchez's wrongful death claim.  (ECF No. 83 at 33.)  Defendants assert that Plaintiffs did not plead a theory of direct liability in the SAC.  (ECF No. 90 at 16.)  This is not true.  (*See* ECF No. 75 at ¶ 125.)  This appears to be the only ground on which Defendants seek summary judgment for Plaintiffs' wrongful death theory of direct public entity liability.  The Court, therefore, denies the motion.

1          5.      Defendants' motion is denied as to all other claims.

2

3

4   IT IS SO ORDERED.

5       Dated:    November 14, 2023    _____

6                                       UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28